**STATE OF LOUISIANA, Plaintiff,**

v.

**Caspar W. WEINBERGER, Secretary, Department of Health, Education and Welfare, et al., Defendants.**

**State of South Carolina and State of Montana, Intervenors.**

**Civ. A. No. 73-1763.**

United States District Court, E. D. Louisiana.

Nov. 30, 1973.

---

2. It is entirely possible some individual, a retiree perhaps, may join the union for the mere fellowship that it provides.

William J. Guste, Jr., Atty. Gen., Warren E. Mouledoux, First Asst. Atty. Gen., C. James Gelpi, Second Asst. Atty. Gen., Kendall L. Vick, Asst. Atty. Gen., Dale C. Wilks, Sp. Counsel, State of Louisiana, New Orleans, La., for plaintiff.

Gerald J. Gallinghouse, U. S. Atty., John H. Musser, IV, Asst. U. S. Atty., New Orleans, La., for defendants.

Daniel R. McLeod, Atty. Gen., C. Tolbert Goolsby, Jr., Deputy Atty. Gen., Karen L. Henderson, Sp. Counsel, State of South Carolina, Columbia, S. C., for intervenor State of South Carolina.

Robert L. Woodahl, Atty. Gen., State of Montana, for intervenor State of Montana.

HEEBE, Chief Judge:

This civil action was brought by the State of Louisiana to compel the defendants, Caspar W. Weinberger, Secretary of the Department of Health, Education and Welfare, John R. Ottina, United States Commissioner of Education, and Roy L. Ash, Director of the Office of Management and Budget, to allot, release and distribute federal funds authorized and appropriated by Congress under the Library Services and Construction Act of 1956, 20 U.S.C. § 351 et seq. (hereafter LSCA) and the National Defense Education Act of 1958, 20 U.S.C. § 401 et seq. (hereafter NDEA). The action by the State was brought for declaratory judgment seeking to have defendants' impoundment of appropriated funds declared illegal as to both LSCA and NDEA, injunctive relief and relief in the nature of mandamus to compel defendants to comply with the Congressional mandates expressed in both Acts. The State has alleged, and this Court has so found, that the State of Louisiana is eligible and entitled to funds distributable by the Commissioner of the Office of Education under both LSCA and Title III of NDEA, having submitted plans, applications and requests which were approved in the manner required by these Acts.

The matter came on for hearing before this Court on plaintiff's motions for preliminary injunction and summary judgment and on defendants' cross motion to dismiss or in the alternative for summary judgment. At that time, argument was also heard on the motions of the States of South Carolina and Montana to intervene as plaintiffs. These motions were granted at the close of the hearing. Some short time later, the State of Louisiana filed motions to maintain this suit as a class action and to amend its complaint accordingly.

Before turning to the merits of this case, we first dispose of the question of the appropriateness of permitting this suit to go forward as a class action. Defendants oppose the State of Louisiana's motion for leave to maintain a class action on three grounds: (1) that the class is not so numerous that members could not have been joined; (2) that it is undesirable to concentrate litigation in this forum; and (3) that the funds being sought have lapsed into the general fund, under the provisions of 31 U.S.C. § 701(a)(2), and are no longer available for obligation to the proposed members of the class.

Defendants assert that the maximum number of states involved is thirty, a number not so large that they could not have been joined as plaintiffs. Rule 23(a) F.R.Civ.P. requires as one of the four prerequisites for a class action that the class be "so numerous that joinder of all members is impracticable." We accept the definition of the class as proposed by the State of Louisiana. The class will include all States which have applied for and are eligible to receive federal funds under LSCA and Title III of NDEA, excluding those States that have initiated their own suit and received judgment with regard to both LSCA and NDEA III funds and those States which are already parties to this action. Further, the class will consist of two subclasses: (1) those States that have instituted their own suit and received judgment with regard to LSCA funds but not NDEA III funds; and

(2) those States that have instituted their own suit and received judgment with regard to NDEA III funds but not LSCA funds. There are only two suits that this Court is aware of which involve the funds in question and in which there is a final determination.[1] One deals with LSCA funds and one with NDEA III funds. On present knowledge, this is the first suit which combines a request for relief as to both funds. A comparison of the two prior suits indicates no mutuality of parties plaintiffs (including intervenors). It, therefore, appears that potentially the size of the class involved here is fifty states. Of course, whether or not a class action will be permitted is discretionary with the court. Cases dealing with the question are inconsistent and, consequently, of not much assistance. Generally, the considerations in making a decision on this question are stated as follows:

> "For the class to be large enough to permit a class suit, impossibility of joinder is not required. Extreme difficulty *or impracticability of joinder is sufficient.* One court has referred to the 'numbers game aspect of Rule 23,' but it is clear that no numerical test is possible. Groups of as many as 39 have been held too small for a class action, while groups of 40 or more have been held sufficient, but this does not mean that such results should always be reached. The requirement of a numerous class is intended to protect members of a small class from being deprived of their rights without a day in court, and in a particular case this object should be weighed in the light of the situation that exists." Wright, Handbook of the Law of Federal Courts, 2d Ed., 1970, p. 308. (emphasis added)

We think the facts before us cover these considerations and that the impracticability of the joinder of possibly all fifty states is clear. Therefore, we find, contrary to the defendants' position, that the first prerequisite of Rule 23(a) is met. In addition, although the maintenance of the class action has not been challenged by the defendants with respect to the other prerequisites of Rule 23(a), these, too, are clearly met.[2] Furthermore, plaintiffs' suit falls into at least two of the categories for which class suits are permissible pursuant to subdivision (b) of Rule 23. This is true with respect to Rule 23(b)(1)(A) in that the prosecution of separate actions by members of the class will create the risk of inconsistent adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the defendants. It is likewise true with respect to Rule 23(b)(1)(B) in that an adjudication as to the individual plaintiffs alone will, as a practical matter, be dispositive of the interests of other members of the class not parties to the litigation. *See,* Commonwealth of Pennsylvania v. James T. Lynn, 362 F.Supp. 1363 (D.D.C.1973).

The defendants contend, secondly, that "it is not desirable to concentrate litigation in this forum." This assertion is not expanded upon in any relevant sense in defendants' memorandum in support of their opposition. Suffice it to say, it is just as desirable to concentrate litigation in this forum as in any other once it is shown that the requirements for maintaining a class action have been met.

The third basis for opposition to the class action, that the funds being sought have lapsed into the general fund pursuant to 31 U.S.C. § 701(a)(2) and there are no funds available to the pro-

---

1. State of Oklahoma v. Caspar W. Weinberger, 360 F.Supp. 724 (W.D.Okl.1973), (LSCA) *and* Commonwealth of Massachusetts v. Caspar W. Weinberger (D.D.C.1973), Civil Action No. 1308–73 and 1322–73, July 30, 1973 (NDEA).

2. The other three prerequisites to maintaining a class action listed in Rule 23(a) are: (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

posed members of the class, has already been rejected by this Court when it granted the intervention sought by the States of South Carolina and Montana. Funds appropriated for expenditure under both LSCA, 20 U.S.C. § 351, et seq., and NDEA, 20 U.S.C. § 401, et seq., were so appropriated pursuant to Public Law 92–334, as amended, for fiscal year 1973 which ended on June 30, 1973. The statute which the defendants rely on, 31 U.S.C. § 701(a)(2), provides in part that:

> ". . . [u]pon the expiration of the period of availability for obligation, the unobligated balance shall be withdrawn and, if the appropriation was derived in whole or in part from the general fund, shall revert to such fund . . . ."

This Court does not agree with defendants that this section can, or should, be used to provide a defense to the Executive Branch against suits to compel the payment of funds appropriated by Congress and impounded by the Executive Branch during and through the applicable fiscal year. Section 701(a)(2), which defendants rely on, is part of a housekeeping measure which was enacted basically to simplify accounting and facilitate the payment of obligations with respect to appropriation accounts. The House Report on this bill, contained in the Legislative History, which indicates that the House bill was the version passed, 1956 U.S.Code Cong. and Adm. News, p. 3520, has no reference at all to the legal effect of this section on future causes of action nor is there any indication that it assumes any judicial function. The House Report states that one of the two major respects in which the bill is designed to improve the accounting procedure of the government is "to authorize the agencies of the Government to pay those bills on which there is no dispute but for which the appropriations have lapsed and make them chargeable to the lapsed appropriations in the

same manner as bills payable from currently available appropriations. This is accomplished in the Proviso to § 701(a)(2) which reads:

> "That when it is determined necessary by the head of the agency concerned that a portion of the unobligated balance withdrawn is required to liquidate obligations and effect adjustments, *such portion of the unobligated balance may be restored to the appropriate accounts.*" (emphasis added)

Therefore, we are inclined to believe that there is nothing sacrosanct about appropriated funds which have reverted to the general fund. The defendants' position appears to be a "red-herring" which obscures the fact that members of the class will be States which have, prior to the end of the applicable fiscal year, complied with all the requirements imposed by the acts involved and then claim that, once there is compliance, the Executive Branch has been mandated by Congress to allocate the funds which it appropriated for such purpose. And this Court has already indicated at the hearing on this matter that it is inclined to believe that allocation of these funds was mandatory.

In addition, it has long been the law "that lapse of appropriation, failure of appropriation, exhaustion of appropriation, do not of themselves preclude recovery for compensation otherwise due." Lovett v. United States, 66 F. Supp. 142, 146, 104 Ct.Cl. 557 (1945) aff'd on other grounds 328 U.S. 303, 66 S. Ct. 1073, 90 L.Ed. 1252 (1946); *but see*, concurring opinion of Frankfurter, J., at p. 318, 66 S.Ct. at p. 1080. Although we are aware that the claim asserted here is not one for compensation, we think the situations are analogous enough for us to take the same position as the Court of Claims did in the *Lovett* case, *supra*, at p. 147, that we are dealing with questions of legal liabilities and not with questions of appropriations.[3]

3. If this position is sound, additional support for the class action at this time can be found in 1 U.S.C. § 109. "The general law

relating to the preservation of legal rights and remedies under a pre-existing statute is Title 1, Sec. 109, U.S.C.A., which provides:

In addition to the position taken by this Court on this matter, intervenors herein relied on the General Education Provisions Act, 20 U.S.C. § 1225(b), to support their position that the funds which were appropriated by Congress to finance Titles I, II and III of LSCA and Title III of NDEA during fiscal year 1973 but which were not obligated and expended prior to June 30, 1973, remain available for obligation and expenditure through June 30, 1974. This section reads, in part, that:

"Notwithstanding any other provision of law, unless enacted in specific limitation of the provisions of this subsection, any funds from appropriations to carry out any programs to which this chapter is applicable during any fiscal year, ending prior to July 1, 1973, which are not obligated and expended prior to the beginning of the fiscal year succeeding the fiscal year for which such funds were appropriated shall remain available for obligation and expenditure during such succeeding fiscal year."

Section 1221(a) of the General Education Provisions Act makes § 1225(b) applicable "to any program for which the Commissioner of Education has responsibility for administration" which would include both the LSCA programs under Titles I, II and III and Title III of the NDEA which are administered by the Commissioner of Education. (20 U.S.C. §§ 351a & 351c and 20 U.S.C. §§ 403 & 442, respectively.) There is no legislative history on § 1225(b), and we are not in a position to say that this is not an appropriate reading of this section. This would mean that according to § 1225(b), the funds involved here did not lapse at the end of the fiscal year 1973.[4]

■■ Defendants oppose the motions for preliminary injunction and summary judgment basically on the same grounds. They assert that the Court lacks jurisdiction over the subject matter not only because the suit is barred by sovereign immunity but also involves what is essentially a political question reserved for resolution by the political branches of government. It has

---

[in part] '. . . The expiration of a temporary statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, *unless the temporary statute shall so expressly provide*, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.'" United States v. Carter, 171 F.2d 530, 532 (5th Cir. 1948). *See, also,* Allen v. Grand Cent. Aircraft Co., 347 U.S. 535, 74 S.Ct. 745, 98 L. Ed. 933 (1953).

4. *But, see,* the Legislative History relative to the following section, 20 U.S.C.A. § 1226, which reads in part:
"Statutory budget ceilings and other general legislation relating to executive control of appropriations after they have been appropriated do not apply to funds appropriated to the Office of Education. Discussion of this provision during the acceptance of the conference report on the Revenue and Expenditure Control Act of 1969 makes clear that that act in no way overrides the effect of section 406.
"The exemption contained in section 406 applies to the provisions of chapter II of

title 31, United States Code, when actions authorized by such provisions would act to prevent appropriations to which such section 406 is applicable from being expended in the time and manner provided for in the appropriate authorizing and appropriations acts.
"The committee notes that funds for education programs are appropriated to the Office of Education. In the case of almost all education programs, the primary administrative responsibility is vested in the Commissioner of Education. *The Commissioner acts under the general supervision of the Secretary. This being the case, actions by the Bureau of the Budget and the Comptroller of the Department of Health, Education, and Welfare which have the effect of delaying the release of education appropriations beyond the time when they can be properly and efficiently obligated and expended prior to the time when failure to do so results in reversion to the Treasury are in contravention of the spirit of section 406 and of the appropriations act.*" 1970 U.S.Code Cong. and Adm.News, pp. 2768, 2821. (emphasis added)

now been held in several cases that the sovereign immunity doctrine does not bar impoundment suits which are based on the allegation that defendants' actions are beyond the scope of their statutory authority and are, therefore, unconstitutional. In addition, these suits assert that the allotments or disbursements involved are specifically required by Congress. Commonwealth of Pennsylvania v. James T. Lynn, *supra*; Commonwealth of Massachusetts v. Caspar W. Weinberger, *supra*. It is for this reason, that an impoundment suit is based on the theory that the act of impounding is contrary to constitutional and statutory limitations on the executive power, that the doctrine does not bar such a suit. "It has been said, however, that if a suit seeks a judgment that 'would expend itself on the public Treasury,' it is a suit against the sovereign and the courts have no authority to entertain it. But this doctrine has not prevented the courts from ordering the payment of claims based upon acts of Congress, even without an explicit waiver of sovereign immunity. As one court has said, since the Constitution vests the power over the government's property in Congress, any action by Congress to expend that property amounts, *pro tanto*, to a waiver of sovereign immunity that subsequent administrative actions contrary to congressional policy cannot affect. In other words, if a plaintiff claims funds that Congress has, by statute, directed him to have, the executive may not invoke sovereign immunity to prevent the will of the sovereign from being carried out." Archer, Impounding of Funds, 40 Univ.Chicago L.Rev. 328, 349 (1973), and cases cited therein. With respect to whether this case falls within the limits on justiciability defined by the political question doctrine, the issue presented is not that defendants should exercise any possible discretion granted them under the statutes involved here but whether Congress has granted them unlimited discretion to withhold funds that Congress has appropriated. Therefore, impounding contro-

versies involve the interpretation and enforcement of the law which raises no political questions so as to make them nonjusticiable according to the standards set forth in Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Commonwealth of Massachusetts v. Caspar W. Weinberger, *supra*, p. 4; Impounding of Funds, *supra*, pp. 343–346.

█ Defendants further contend that the complaint fails to state a claim upon which relief may be granted in that Public Law 92–334 has imposed no duty upon defendants to expend a specific sum under either NDEA or LSCA nor has Congress imposed a mandatory spending limit on the executive. This, of course, brings us to the merits of the controversy. As previously indicated, two courts have interpreted the pertinent statutory language under NDEA and LSCA. Both of these courts have set out in their opinions the history of the appropriations in effect to fund these Acts during fiscal year 1973 and the history of the controversy which involves an executive policy of impounding appropriated funds so as to affect all HEW programs for fiscal year 1973. It would serve no purpose to repeat this history here. Authorization of various sums to be appropriated pursuant to Titles I, II and III of LSCA is provided for in 20 U.S.C.A. § 351b. The formulas by which appropriated funds are to be allotted to the States is provided in 20 U.S.C.A. § 351c. We agree with the court in State of Oklahoma v. Caspar W. Weinberger, *supra*, that "[b]y use of the word 'shall' in Section 351c with respect to the minimum allotment to each State as well as to allotment of the remainder of the sums appropriated, it is clear that Congress intended that such allotment be mandatory. Such allotment is conditioned only upon the States' meeting the requirements with respect to state plans and programs provided by 20 U.S.C. § 351d."

On examination of Title III–A of the NDEA, 20 U.S.C.A. § 442(a)(1) provides for an allotment to be apportioned

among the States in accordance with a ratio established in § 442(a)(2). Section 444 provides for the payment of matching funds out of a State's apportioned share to be made to any State which has submitted a plan approved by the Commissioner of Education as meeting the requirements set forth in § 443. We also agree with the court in Commonwealth of Massachusetts v. Caspar W. Weinberger, *supra*, in its interpretation of the relevant language with respect to NDEA funds. As that court reads § 442, "that section grants the Commissioner discretion to reserve, for purposes designated in § 442(a)(1), up to 16 percent of the total amount appropriated by Congress for a given fiscal year. However, the Commissioner is obligated to allot all of whatever remains after he has reserved whatever amounts he chooses within those limits prescribed by Congress. Indeed, the apportionment ratio for determining the shares of individual States would make no sense if the Commissioner were free to allot whatever portion of the remainder he chose, for one element of the ratio is 'the amount of *such remainder*' (after the Commissioner has reserved the portions he is authorized to reserve). If the Commissioner allots less than the full amount of the remainder, but then apportions individual shares according to the express terms of the ratio, the sum of the shares would exceed the allotment for the whole. Further internal support for the Court's reading of § 442(a) is to be found in the reallotment provisions of § 442(c) and in § 445, concerning loans to non-profit private schools, in which Congress used permissive language ('the Commissioner is authorized to make loans') which contrasts markedly with the mandatory language ('the Commissioner shall allot') of § 442(a)."

As originally enacted, the appropriations provided for by Public Law 92–334 § 101(d) were to be effective until August 18, 1972, or earlier if a formal appropriations Act were passed and the continuing appropriation was extended on several occasions. The final extension, H.J.Res. 345, Public Law 93–9, carried the appropriations through June 30, 1973. The appropriation made available for the programs in question "[s]uch amounts as may be necessary for continuing the . . . activities, but at a rate for operations not in excess of the current rate . . . ." For NDEA, Title III, the appropriation for fiscal year ending June 30, 1972, was $50,000,000. These amounts are agreed to be the "current rate." Defendants contend that there is no mandate in this appropriation which requires the executive to take any specific action or spend any specific amount of money, and they rely on the language in the appropriation which provides that expenditures were not to exceed the dollar limit. This, however, is contrary to Congressional intent in funding these programs as stated in the House Report concerning the last amendment to the Resolution, extending funding to June 30, 1973:

"The Continuing Resolution appropriates funds for the continuation of ongoing programs. It does not authorize the Executive Branch either to start new programs or to stop ongoing ones. The Resolution, within its terms and conditions, has the full force and effect of an appropriation act." (H.R.Rep.No.93–20, 93rd Cong. 1st Sess. 2 (1973))

With respect to NDEA, Title III, part A defendants have allotted only two million dollars of the fifty-million-dollar appropriation. This amount is sufficient only to maintain in place the staffs who would administer Title III, part A grants if there were any grants to administer. Of the eighty-four million, five hundred thousand dollars appropriated by Congress for the funding of LSCA programs, defendants have allotted only thirty-two million, seven hundred and thirty thousand dollars. Clearly neither of these allotments comply with the Congressional intent set forth above. *See*, Commonwealth of Massa-

chusetts v. Caspar W. Weinberger, *supra*, at p. 6.

As previously noted, plaintiff and the intervenors are in full compliance with all requirements for receipt of funds distributable by the Commissioner of the Office of Education, including the submission and approval of State plans, applications and requests required by NDEA and LSCA and by rules and regulations of defendants. The remaining point, then, is determining the effect of mandatory language in the statutes and the answer is simply that the Supreme Court in Kendall v. United States ex rel. Stokes, 37 U.S. (12 Pet.) 524, 9 L.Ed. 1181 (1838), made clear that the executive may not refuse to spend mandated appropriations.[5]

Finally, as was the court in Commonwealth of Massachusetts v. Caspar W. Weinberger, *supra*, this Court is decidedly unable to accept defendants' position that, regardless of the clear intent of Congress as expressed in the wording of a statute, the executive may exercise his broad powers pursuant to Article II of the Constitution, which encompasses the power to combat inflation by controlling spending even where this means refusal to comply with the terms of a statute. Defendants read this into the language of the Constitution, Section 3 of Article II, which directs that the executive "shall take Care that the Laws be faithfully executed." Justice Thompson cautioned in the *Kendall* case, *supra*, at p. 611, 9 L.Ed. 1181, that "[t]o contend, that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the Constitution, and entirely inadmissible." Furthermore, we also find appropriate the following quotation from the concurring opinion of Mr. Justice Frankfurter in Youngstown Co. v. Sawyer, 343 U.S. 579, 613–614, 72 S.Ct. 863, 96 L.Ed. 1153 (1951), which encompasses the thoughts

of Mr. Justice Brandeis on the subject as well:

"A scheme of government like ours no doubt at times feels the lack of power to act with complete, all-embracing, swiftly moving authority. No doubt a government with distributed authority, subject to be challenged in the courts of law, at least long enough to consider and adjudicate the challenge, labors under restrictions from which other governments are free. It has not been our tradition to envy such governments. In any event our government was designed to have such restrictions. The price was deemed not too high in view of the safeguards which these restrictions afford. I know no more impressive words on this subject than those of Mr. Justice Brandeis:

'The doctrine of the separation of powers was adopted by the Convention of 1787, not to promote 'efficiency but to preclude the exercise of arbitrary power. The purpose was not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy.' Myers v. United States, 272 U.S. 52, 240, 293, 47 S. Ct. 21, 71 L.Ed. 160."

Based on the reasoning of the Court set forth above, the Court grants plaintiffs' motions for summary judgment, making it unnecessary to decide the motions for a preliminary injunction. Defendants have attempted to create a dispute as to the material facts in order to defeat the motion for summary judgment. However, there is no dispute as to the relevant facts upon which the Court has relied. Defendants have created "facts" which revolve around the administration's policy to hold overall federal spending in check. One of the

5. *See*, Commonwealth of Pennsylvania v. James T. Lynn, *supra;* Commonwealth of Massachusetts v. Caspar W. Weinberger, *supra;* State of Oklahoma v. Caspar W. Wein-

berger, *supra*; Youngstown Sheet & Tube v. Sawyer, 342 U.S. 579, 72 S.Ct. 863, 96 L. Ed. 1153 (1952).

material facts stated to be in dispute is that:

"11. It is highly undesirable for the Government to commit itself to exclusive one-sided reliance on taxation to achieve the desired control of the budget position. Therefore, it is essential, from the standpoint of economic stability, that the Government, taken as a whole, should have effective means of controlling its total ex- and possibly within shorter periods. Congress has not accepted this responsibility and has no reliable machinery for doing so. This leaves the responsibility with the Administration, and impoundment is a necessary instrument for discharge."

The remaining ten "fact" issues are much in the same vein and the Court cannot accept defendants' opposition on this basis. Furthermore, we have already stated that the executive cannot effectuate his policy by overriding express Congressional intent.

As a result of defendants' unconstitutional and unlawful impoundment of appropriated funds for fiscal year 1973, the State of Louisiana, its local political subdivisions and its citizens have suffered a direct loss in LSCA funds of approximately $792,000 and in NDEA funds in excess of $600,000.

As a result of defendants' unconstitutional and unlawful impoundment of appropriated funds for fiscal year 1973, the State of South Carolina, its local political subdivisions and its citizens have suffered a direct loss in LSCA funds in excess of $600,000 and in NDEA funds in excess of $900,000.

As a result of defendants' unconstitutional and unlawful impoundment of appropriated funds for fiscal year 1973, the State of Montana, its local political subdivisions and its citizens have suffered a direct loss in LSCA funds in excess of $258,000 and in NDEA funds in excess of $207,000. Accordingly,

It is the order of the court that the motions of plaintiff, the State of Louisiana, to maintain this suit as a class action and to amend their complaint accordingly, be, and the same is hereby, granted.

It is the further order of the court that defendants' motion to dismiss or in the alternative for summary judgment, be, and the same is hereby, denied.

It is the further order of the court that the motion of plaintiff and intervenors for summary judgment, be, and the same is hereby, granted. Accordingly, plaintiff, the State of Louisiana, is directed to prepare a proposed judgment and submit copies to all other parties and to the Court.