564 F.2d 583
 10 ERC 1633, 184 U.S.App.D.C. 98, 7
Envtl. L. Rep. 20,737
 NATIONAL ASSOCIATION OF REGIONAL COUNCILS, a corporation, Appellee,
v.
Douglas M. COSTLE, Individually and as Administrator of the
U. S. Environmental Protection Agency, et al., Appellants.
 No. 76-1970.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 1, 1977.
Decided Sept. 8, 1977.
 
 Edmund B. Clark, Atty., Dept. of Justice, Washington, D. C., with whom Peter R. Taft, Asst. Atty. Gen., and Douglas K. Miller and Michael A. McCord, Attys., Dept. of Justice, Washington, D. C., were on the brief, for appellants. Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for appellants.
 James P. Schaller, Washington, D. C., with whom John J. Bosley, Washington, D. C., was on the brief, for appellee.
 Warren K. Rich, Asst. Atty. Gen., State of Maryland, Annapolis, Md., filed a brief on behalf of the State of Maryland as amicus curiae urging affirmance.
 Before TAMM, LEVENTHAL and MacKINNON, Circuit Judges.
 Opinion for the court filed by TAMM, Circuit Judge.
 TAMM, Circuit Judge:
 
 
 1
 The Administrator of the Environmental Protection Agency (EPA) has appealed from a judgment of the United States District Court for the District of Columbia which orders that the unobligated balance of EPA budget authority provided by subsection 208(f)(3) of the Federal Water Pollution Control Act Amendments of 1972 (hereinafter 1972 FWPCA Amendments) for fiscal years 1973 and 1974 should remain available until September 30, 1977, and that those funds should be used to finance 100 rather than 75 percent of the reasonable cost of section 208 planning agencies. We hold that the 1973 and 1974 subsection 208(f)(3) budget authority lapsed before this suit was filed and that the district court had no power to revive it. We therefore reverse that part of the court's order. We agree that the court can and should have suspended the effective date of the provision in subsection 208(f)(2) lowering the proportion of federal funding from 100 to 75 percent. Since the court's order as it now stands, however, provides that the 100 percent financing should come from the lapsed 1973 and 1974 contract authority rather than current or future appropriations by Congress, we remand this case for modifications of that part of the district court order.
 
 I. BACKGROUND
 
 2
 As part of a comprehensive nationwide attack on the problems of water pollution, the 1972 FWPCA Amendments include an action-forcing provision, section 208, designed to encourage and facilitate the development of area-wide waste treatment management plans. Subsection 208(a) outlines a statutory timetable for the designation of local planning agencies responsible for the actual planning to be funded by federal grants. The Administrator of the Environmental Protection Agency was directed to publish guidelines for the identification of areas with substantial water quality control problems within ninety days of enactment of the Act. Within sixty days of the publication of those guidelines, the Governors of the States, or the chief local elected officials if a Governor fails to act, were authorized to identify areas with substantial water quality control problems and within an additional 120 days to define the boundaries of those areas and designate a single organization for each area capable of developing an effective area-wide waste treatment management plan. For any area which is not assigned to a planning agency by this designation process, the Act provides that the States shall act as the planning agency. To finance these planning agencies, subsection 208(f) provides that the Administrator shall make grants to them for the reasonable costs of developing and operating the planning process required by the Act.
 
 
 3
 The 1972 FWPCA Amendments became law on October 18, 1972, and the following schedule indicates the latest possible date for the designation of planning agencies to whom planning grants could be made if each of its specified time limits were met:
 
 
 4
 January 10, 1973: last day for issuance of
 
 
 5
 guidelines by EPA
 
 
 6
 March 11, 1973: last day for identification of
 
 
 7
 areas with substantial water
 
 
 8
 quality control problems by
 
 Governors
 
 9
 July 9, 1973: last day for designation of
 
 
 10
 boundaries of identified areas
 
 
 11
 and responsible planning agency.
 
 
 12
 Actual implementation of section 208 has fallen short of this statutory schedule. The EPA did not begin to promulgate any guidelines for the designation of planning agencies for areas with substantial water quality control problems until September 14, 1973, more than nine months after the statutory deadline, and these guidelines were declared invalid for inadequately implementing the requirements of the Act.[1] Revised regulations were not issued until November 28, 1975.[2] Only approximately $13 million of the $150 million in contract authority authorized for 100 percent financing of section 208 planning agencies during fiscal years 1973 and 1974 has actually been obligated.[3] Nevertheless, EPA has taken the position that the expiration of those fiscal years, on June 30, 1973, and June 30, 1974, respectively,[4] deprives it of any authority to obligate those funds and has indicated its intention to adhere to the 75 percent limitation of subsection 208(f) applicable to all funding of planning agencies awarded after June 30, 1975.
 
 
 13
 On October 16, 1975, the National Association of Regional Councils (NARC) filed suit in the United States District Court for the District of Columbia challenging the Administrator's interpretation of his funding authority and seeking a declaratory judgment that the $137 million unobligated balance of the contract authority for fiscal years 1973 and 1974 should be made available for 100 percent financing of section 208 planning agencies. The district court entered summary judgment in favor of NARC, reasoning that, but for the EPA's illegal delay of implementing regulations, the authorizations for fiscal years 1973 and 1974 would have been obligated. The final order of the district court directs that the unobligated balance of the contract authority provided by subsection 208(f) for fiscal years 1973 and 1974 shall remain available until September 30, 1977, and that the amount granted to planning agencies from this fund shall be 100 percent of their reasonable costs.
 
 
 14
 As a necessary, though not sufficient, condition to affirming the district court's order, we would have to hold either that the Administrator's contract authority for fiscal years 1973 and 1974 did not lapse at the end of those years, or that the district court had the power to revive the spending authority which had terminated. In the particular circumstances of this case, we cannot accept either proposition, and therefore we must reverse the district court.
 
 II. BUDGET AUTHORITY OF EPA
 
 15
 Government agencies may only enter into obligations to pay money if they have been granted such authority by Congress.[5] Amounts so authorized by Congress are termed collectively "budget authority" and can be subdivided into three conceptually distinct categories appropriations, contract authority, and borrowing authority.[6] Appropriations permit an agency to incur obligations and to make payments on obligations. Contract authority is legislative authorization for an agency to create obligations in advance of an appropriation. It requires a subsequent appropriation or some other source of funds before the obligation incurred may actually be liquidated by the outlay of monies. Borrowing authority permits an agency to spend debt receipts.[7]
 
 
 16
 Subsection 208(f) of the 1972 FWPCA Amendments granted the Administrator of the EPA contract authority to create obligations upon his approval of grant applications for support of planning agencies. Although the exact amount of an agency's budget authority may be left indefinite, subsection 208(f) follows the more typical pattern and sets definite limits on the Administrator's contract authority. It states:
 
 
 17
 There is authorized to be appropriated to carry out this subsection not to exceed $50,000,000 for the fiscal year ending June 30, 1973, not to exceed $100,000,000 for the fiscal year ending June 30, 1974, and not to exceed $150,000,000 for the fiscal year ending June 30, 1975.
 
 
 18
 33 U.S.C. § 1288(f)(3) (Supp. V 1975).
 
 
 19
 The Administrator contends that these limitations restrict his contract authority to the fiscal years specified for each amount and that any authority which has not been obligated by the end of its fiscal year terminates and is no longer available. NARC disagrees and urges that, in light of the legislative history behind section 208, we should read subsection 208(f)(3) as an authorization for continuing contract authority which remains available until expended. Although we may agree with NARC's contention that Congress enacted subsection 208(f)(3) on the presumption that the EPA would administer the Act in conformance with the timetable established by subsections 208(a)-(c), that does not change the fact that the legislators did not explicitly direct that the budget authority provided in subsection 208(f)(3) should remain available beyond the fiscal year specified. Instead, Congress simply provided three amounts as the top limits available for appropriation for the fiscal years 1973, 1974, and 1975, respectively.
 
 
 20
 As a general rule, when budget authority is made available for a specified period, it terminates at the end of that time.[8] When Congress intends that it should remain available beyond the year for which it is authorized, Congress has included express language to that effect in the legislation.[9] It may be more typical for budget authority limited to one fiscal year to take the form of appropriations and for contract authority to extend over several years or indefinitely until exhausted, but there is nothing about contract authority which makes it inherently incapable of limitation to one fiscal year.[10] Therefore, since subsection 208(f)(3) uses the language commonly associated with budget authority limited to one year, and since there is no specific statutory directive that it should remain available beyond one year, we hold that the contract authority provided for fiscal years 1973 and 1974 which was not obligated by the end of its respective fiscal year lapsed and was not available to the EPA after that date.
 
 
 21
 NARC argues that such a result runs counter to the purpose of section 208 and allows the EPA to frustrate the intent of Congress by administrative delay of the necessary preconditions for the filing of applications for funding under subsection 208(f). This, indeed, is a consequence of limiting the budget authority of EPA to single fiscal years, and, perhaps, if Congress had contemplated the possibility of such a consequence, it would have explicitly provided for continuing budget authority. It did not do so, however, and we cannot now rewrite this statute as it might have been written had all contingencies been considered. The task of the courts is to construe
 
 
 22
 legislative language, not to correct it. III. AUTHORITY OF
 
 COURTS TO ORDER OBLIGATION OF BUDGET AUTHORITY
 AFTER DATE OF LAPSE
 
 23
 A determination that the contract authority provided in subsection 208(f)(3) was limited to the respective fiscal years for which it was authorized does not dispose of this appeal. We have only recently reaffirmed the power of the courts to order that funds be held available beyond their statutory lapse date if equity so requires. Jacksonville Port Authority v. Adams, 181 U.S.App.D.C. 175, 178-180, 556 F.2d 52, 55-57 (1977); Los Angeles v. Adams, 181 U.S.App.D.C. 163, 168-169, 556 F.2d 40, 45-46 (1977); National Association of Neighborhood Health Centers, Inc. v. Mathews, 179 U.S.App.D.C. 135, 152-153, 551 F.2d 321, 338-39 (1976). None of these cases, however, involved unobligated budget authority which had lapsed before suit was filed. In Neighborhood Health Centers, we ordered the Department of Health, Education and Welfare to direct its state grantees to recover and reallocate funds which had been illegally awarded to the wrong category of recipients. In response to HEW's arguments that some of those funds would automatically revert to the Treasury upon recovery because their termination date had passed and that the rest would soon be beyond its authority because their termination dates were rapidly approaching, we noted that an equity court may order funds to be held available beyond a statutory lapse. None of the funds at issue had actually lapsed, however; they had been obligated before their termination dates, and our decision simply provided that they be redirected. To the extent that it might be necessary to effectuate that remedy, we recognized that the district court could suspend the operation of any provision which might otherwise terminate the authority to spend those funds. 179 U.S.App.D.C. at 152-153, 551 F.2d at 338-39. Similarly, in Los Angeles, we found that since the district court had ordered the obligation of $9.6 million in budget authority five days before its termination date, the court on remand could order the award of a lesser sum even though we held that the statutory construction on which the original award had been made was incorrect. 181 U.S.App.D.C. at 174, 556 F.2d at 51. Finally, in Jacksonville, the plaintiff filed suit and applied for a temporary restraining order to direct the obligation of funds before the cutoff date of the relevant budget authority. The district court denied its application, and after the cutoff date had passed, dismissed the case as moot, reasoning that the defendant was no longer capable of taking the action which the plaintiff sought. On appeal, we held that it was an abuse of discretion to deny the temporary restraining order and that relief was still available because it would have been available if the district court had initially done what should have been done, viz. granted plaintiff's request for a preservation remedy filed before the passage of the termination date.
 
 
 24
 In the case now before us, suit was not filed and the district court did not acquire jurisdiction of the case until after the dates on which the contract authority provided in subsection 208(f)(3) for fiscal years 1973 and 1974 had lapsed. Decisions that a court may act to prevent the expiration of budget authority which has not terminated at the time suit is filed are completely consistent with the accepted principle that the equity powers of the courts allow them to take action to preserve the status quo of a dispute and to protect their ability to decide a case properly before them. In such situations, the courts simply suspend the operation of a lapse provision and extend the term of already existing budget authority. If, however, budget authority has lapsed before suit is brought, there is no underlying congressional authorization for the court to preserve. It has vanished, and any order of the court to obligate public money conflicts with the constitutional provision vesting sole power to make such authorizations in the Congress.[11] Equity empowers the courts to prevent the termination of budget authority which exists, but if it does not exist, either because it was never provided or because it has terminated, the Constitution prohibits the courts from creating it no matter how compelling the equities.
 
 
 25
 NARC has referred us to three district court cases which it claims support its contention that a court may reinstate budget authority after it has lapsed. That proposition, however, is not an essential element to the validity of those decisions. In one case, Bennett v. Butz, 386 F.Supp. 1059 (D.Minn.1974), the court had issued a preliminary injunction prior to the expiration of the budget authority at issue to prevent it from lapsing. Id. at 1062. Thus, just as our own decisions discussed above, Bennett only stands for the proposition that a court may interdict the lapsing of existing budget authority, not that it may revive budget authority which has already terminated. The two other cases cited by NARC, Pennsylvania v. Weinberger, 367 F.Supp. 1378 (D.D.C.1973), and Louisiana v. Weinberger, 369 F.Supp. 856 (E.D.La.1973), involved budget authority which the Congress had legislatively made available beyond the date of the court's judgment.[12] See 369 F.Supp. at 861; 367 F.Supp. at 1384-85.
 
 
 26
 NARC relies heavily on the language of the alternative holding in Pennsylvania v. Weinberger that even assuming no congressional extension of the availability of the disputed funds, nonetheless they would not be beyond the court's power because 31 U.S.C. § 701(a)(2) provides that so much of the unobligated balance of an expired appropriation which an agency head determines "is required to liquidate obligations and effect adjustments" may be restored. We cannot accept NARC's contention that this legislation, which was passed to improve the efficiency of government accounting procedures by permitting agencies to adjust the amounts of obligations which prove insufficient because of errors, unforeseen cost increases, or other underestimates in the original award without resort to new congressional appropriations,[13] empowers the courts to revive lapsed budget authority and to direct that it be obligated to parties who had not even applied for funds during the statutory term of that lapsed authority. We also reject any implication in the Pennsylvania opinion that once it is shown that Congress has authorized the restoration of lapsed authority under some circumstances then the courts may order the restoration and obligation of lapsed authority whenever they deem it appropriate.[14] The Constitution vests the power to authorize such obligations solely in the Congress, which has plenary power to circumscribe the exercise of that authority as it sees fit.[15] Thus, unless a court can rely on a statutory authorization, it simply lacks the power to order the obligation of public funds, regardless of how appropriate a remedy that order would be.[16] Since there is no such statutory support for the district court's order in this case, we must reverse its judgment to the extent it commands that the lapsed contract authority of the EPA for fiscal years 1973 and 1974 shall remain available for obligations.
 
 
 27
 IV. 75 PERCENT LIMITATION ON FUNDING OF PLANNING AGENCIES
 
 
 28
 Our decision that the district court did not have the power to order the obligation of contract authority which had lapsed before NARC filed suit does not necessarily require a reversal of its decision that 100 percent funding should be available for the area-wide waste treatment planning process required by section 208. Although the EPA Administrator's contract authority under subsection 208(f)(3) has terminated, the area-wide waste treatment management planning grant program authorized by subsection 208(f)(1) continues under the budget authority of annual appropriations. See J.A. at 12-13; S.Rep. No. 94-326, 94th Cong., 1st Sess. 49 (1975). Of course, to the extent that Congress has authorized the obligation of public funds for grants to section 208 planning agencies, there is no constitutional impediment to a court order that the amounts appropriated be used for 100 percent financing.
 
 
 29
 The question that we must face with respect to this aspect of the district court's order is whether subsection 208(f)(2) bars such full funding. That provision states:
 
 
 30
 The amount granted to any agency under paragraph (1) of this subsection shall be 100 per centum of the costs of developing and operating a continuing areawide waste treatment management planning process . . . for each of the fiscal years ending on June 30, 1973, June 30, 1974, and June 30, 1975, and shall not exceed 75 per centum of such costs in each succeeding fiscal year.
 
 
 31
 33 U.S.C. § 1288(f)(2) (Supp. V 1975). The EPA contends that this provision prohibits the award of any more than 75 percent funding to section 208 planning agencies which apply for grants after the end of fiscal year 1975.
 
 
 32
 To determine what effect to give to a legislative time limit, a court should consider the purpose and design of the entire statutory program of which it is a part. In Ralpho v. Bell, No. 75-2088, slip op. at 35-39 (D.C.Cir. Mar. 29, 1977), this court held that the expiration of the statutory time limit on the legal authority of the Micronesian Claims Commission did not prohibit the Commission from affording appropriate relief to a claimant who had been denied proper consideration because of the Commission's own malfeasance. Similarly, in this case, the time limits of subsection 208(f)(2) should not be invoked to prohibit 100 percent funding in initial grants to section 208 planning agencies which could not apply for such funding before the end of fiscal year 1975 solely because of the failure of the EPA to meet its statutorily mandated deadlines.
 
 
 33
 The legislative history of section 208 clearly demonstrates that Congress intended start-up financing for the area-wide waste treatment management planning process to be at the 100 percent level. Moreover, the time limits specified in subsection 208(f)(2) were selected in light of the statutory timetable of subsection 208(a), which provided for the designation of planning agencies eligible to apply for funding well before the deadlines of 208(f)(2). EPA recalcitrance disrupted the coordination between those subsections and made it impossible for the members of NARC to apply for initial planning grants within the limits specified in subsection 208(f)(2). The district court's order extending the availability of 100 percent funding simply brings the separate timetables of section 208 back into harmony and is fully consistent with the congressional intent and purpose behind that legislation.
 
 
 34
 We cannot affirm the district court's order as it stands, however, since it provides for the 100 percent financing to be granted from the contract authority of subsection 208(f)(3) which lapsed and cannot be revived by court order. Therefore, we remand the case to the district court for modification of its order to provide 100 percent financing for start-up planning grants out of the annual appropriations, or other budget authority, provided by Congress for funding of section 208 for fiscal 1975 and subsequent years. Of course, since it is equally clear that Congress intended to limit 100 percent funding of area-wide waste treatment management planning agencies to some finite amount and time frame, the district court should include similar limitations in its order. The court may consider limiting this funding to those parties who took the necessary steps within the prescribed time periods following November 28, 1975. The total amount of 100 percent funding shall not exceed the total unobligated contract authority for fiscal years 1973 and 1974. We do not, of course, authorize any increase in the total contract authority permitted by the appropriation for 1975 and subsequent fiscal years. We have held that the court may not revive that budget authority after it has lapsed, but it is not prohibited from using those amounts as a measure of the amount of 100 percent of available budget authority which should be used for financing in order to carry out the legislative intent behind section 208.
 
 
 35
 Reversed in part and remanded in part.
 
 
 
 [1]
 See National Resources Defense Council v. Train, 396 F.Supp. 1386, 1391 (D.D.C.1975), appeal pending, No. 75-1873 (D.C.Cir.1977)
 
 
 [2]
 40 Fed.Reg. 55321, 55343 (Nov. 28, 1975)
 
 
 [3]
 Section 208(f) authorized $50 million for planning agencies in fiscal year 1973. None of it was obligated, and only $13 million of the $100 million authorized for fiscal year 1974 was obligated
 
 
 [4]
 Section 501 of the Congressional Budget Act of 1974 changed the federal government's fiscal year from July 1 through June 30 to October 1 through September 30. Pub.L. No. 93-344, 88 Stat. 297 (1974). That change did not become effective until the fiscal year ending in 1977 and thus had no effect on the authorization expiration dates at issue in this case
 
 
 [5]
 See U.S.Const. art. I, § 9, cl. 7; 31 U.S.C. § 665(a) (1970); Hughes Aircraft Co. v. United States, 534 F.2d 889, 906-07 (Ct.Cls. 1976); Maryland Casualty Co. v. United States, 155 F.2d 823 (4th Cir. 1946); Cummings v. Hardee, 70 App.D.C. 18, 102 F.2d 622, cert. denied, 307 U.S. 637, 59 S.Ct. 1033, 83 L.Ed. 1518 (1939)
 
 
 [6]
 The Budget of the United States Government FY1978 at 229 (hereinafter 1978 Budget)
 
 
 [7]
 If the debt receipts arise from borrowings of the United States Treasury they are termed "public debt receipts", but if they arise from agency borrowing directly from the public or a government-administered fund they are called "agency debt receipts."
 
 
 [8]
 See Norcross v. United States, 142 Ct.Cl. 763, 766 (1958); 31 U.S.C. § 718 (1970); 37 Comp.Gen. 861, 863 (1958); 1978 Budget at 229-31. Budget authority made available for obligation during a single fiscal year is termed "1-year" authority. That available for a specified longer period is referred to as "multiple-year" authority, and that available until its objectives are attained is called "no-year" authority. Id. at 229
 
 
 [9]
 See, e. g., Federal-Aid Highway Act, 23 U.S.C. § 203 (1970); Urban Mass Transportation Act, 49 U.S.C. § 1603(b) & (c) (1970)
 
 
 [10]
 It may be that contract authority is generally chosen as the funding mechanism for projects which require a commitment from the Government to expend monies over an extended period of time. The time limitation at issue in this case, however, does not relate to the length of the contract term to which the EPA may commit itself, but to the length of time during which the EPA must commit itself to expend the amount authorized for each fiscal year in subsection 208(f)(3) or lose the authority to make any commitment whatsoever against those sums. Just as with appropriation budget authority, the period for which contract authority is made available defines the limits of the period during which it may be exercised. 32 Comp.Gen. 29, 31 (1952), quoting Office Letter of May 14, 1948, B-76061, to the Director of the Bureau of the Budget
 11 U.S.Const., art. I, § 9, cl. 7; see Reeside v. Walker, 52 U.S. 271, 290-91, 13 L.Ed. 693 (1850); Stitzel-Weller Distillery v. Wickard, 73 App.D.C. 220, 225, 118 F.2d 19, 24 (1941); 2 Story on the Constitution §§ 1346-1349 (5th ed. 1891).
 
 
 [12]
 Both Pennsylvania v. Weinberger and Louisiana v. Weinberger involved the impoundment of funds appropriated for fiscal year 1973 to finance educational programs. In 1970, Congress had passed an amendment to the General Educational Provisions Act, known as the Tydings Amendment, which applied to appropriations for educational programs generally and provides:
 Notwithstanding any other provision of law, unless enacted in specific limitation of the provisions of this subsection, any funds from appropriations to carry out any programs to which this chapter is applicable during any fiscal year, ending prior to July 1, 1973, which are not obligated and expended prior to the beginning of the fiscal year succeeding the fiscal year for which such funds were appropriated shall remain available for obligation and expenditure during such succeeding fiscal year.
 20 U.S.C. § 1225(b) (1970). By force of this provision, the educational funds at issue in Pennsylvania and Louisiana which had been appropriated but impounded during fiscal year 1973 were extended and made available for obligation until June 30, 1974.
 
 
 [13]
 See S.Rep. No. 2266, 84th Cong., 2d Sess. 2, 4-5, 7 (1956); H.R.Rep. No. 2015, 84th Cong., 2d Sess. 5 (1956)
 
 
 [14]
 The district court in Pennsylvania apparently reasoned that an agency head's authority under subsection 701(a)(2) to restore budget authority after its otherwise operable lapsed date proved that the reversion of funds to the Treasury was not irreversible and that the court's power to reach such funds could not be confined by the limitations of subsection 701(a)(2)
 More importantly, the proviso is significant here as an indication that reversion is not an absolute bar to reaching funds after the fiscal year. Once it is determined that the funds can be reached it is the power of the Court, rather than the operation of the proviso, which will effect their restoration.
 The statutory specifications of authority to obligate Federal funds define and limit Defendants' standard operating authority, but do not purport to circumscribe the powers of the Federal Courts to provide appropriate relief when the disputed funds are found to be available.
 
 
 [367]
 F.Supp. at 1386-87. It may be correct to say that the powers of a court to order the expenditure of available funds should not be confined by statutory limitations directed at the executive branch. That statement, however, begs the question at the heart of the Pennsylvania case itself and the case now before us are the disputed funds available for obligation? Only Congress can authorize the obligation of public funds, and, unless a court can refer to such a legislative authorization, there simply are no funds "available" for it to order to be obligated. See notes 15-16 infra and accompanying text
 
 
 [15]
 Harrington v. Bush, 180 U.S.App.D.C. 45, 553 F.2d 190, 194 (1977); Hart v. United States, 16 Ct.Cl. 459, 483-84 (1880)
 
 
 [16]
 In support of its conclusion that lapsed budget authority may be revived by court order alone, the district court in Louisiana v. Weinberger relied on the Court of Claims' statement of the well-established principle "that lapse of appropriation, failure of appropriation, exhaustion of appropriation, do not of themselves preclude recovery for compensation otherwise due." 369 F.Supp. at 860, quoting Lovett v. United States, 66 F.Supp. 142, 104 Ct.Cl. 557, 582 (1945). See also United States v. Vulte, 233 U.S. 509, 34 S.Ct. 664, 58 L.Ed. 1071 (1914); United States v. Langston, 118 U.S. 389, 6 S.Ct. 1185, 30 L.Ed. 164 (1886); Miller v. United States, 86 Ct.Cl. 609 (1938); Leonard v. United States, 80 Ct.Cl. 147 (1934). That principle, however, is inapposite to the district court's conclusion. Its validity flows not from an inherent judicial power to order the obligation of public money but from the fact that the courts do not deal with questions of appropriations at all. Their sole purpose with respect to the claims against the Government over which Congress has given them jurisdiction is to adjudicate the legal liability of the United States. Collins v. United States, 15 Ct.Cl. 22, 35 (1879); see 28 U.S.C. §§ 1346, 1491-1506 (1970 & Supp. V 1975). Of course, in the great majority of circumstances where Congress has given the courts jurisdiction to enter a judgment against the United States, it has also appropriated funds to pay that judgment. For judgments up to $100,000, Congress has provided a standing appropriation. 28 U.S.C. § 2517 (1970); 31 U.S.C. § 724a (1970). Judgments in excess of $100,000 are certified to Congress by the Secretary of the Treasury for a special appropriation, 28 U.S.C. § 2518 (1970); see, e. g., Pub.L. No. 87-545, 76 Stat. 209; S.Doc. No. 84, 87th Cong., 2d Sess. 3, 23-24 (1962); H.R.Doc. No. 558, 87th Cong., 2d Sess. 3, 23-24 (1962). If there is no such appropriation out of which a judgment can be paid, the courts still cannot order that it be satisfied, since "the matter of whether or not an appropriation will be made rests wholly upon the determination of Congress, and with that determination this court has nothing to do." Hetfield v. United States, 78 Ct.Cl. 419, 422 (1933). See generally Glidden Co. v. Zdanok, 370 U.S. 530, 570, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962); Note, The Court of Claims: Judicial Power and Congressional Review, 46 Harv.L.Rev. 677, 685-86 n.63 (1933)