**In re Julie GRUESCHOW, on behalf of herself and all others similarly situated, Plaintiff,**

**v.**

**Patricia HARRIS, Secretary of the U.S. Department of Health and Human Services; Wellington Webb, Denver Principal Regional Official, Department of Health and Human Services; William Janklow, Governor of the State of South Dakota; and the Agents, Employees and Successors of the Above, Defendants.**

**Civ. No. 80–3040.**

United States District Court, D. South Dakota, C. D.

June 30, 1980.

---

Mary Ellen McEldowney, Black Hills Legal Services, Inc., Rapid City, S.D., for plaintiff.

Janice C. Godtland, S.D. Dept. of Social Services, Pierre, S.D. for S.D. Department of Social Services.

Steve Zinter, Pierre, S.D., for Governor William Janklow.

Dawn Bowen, Asst. U.S. Atty., Pierre, S.D., for defendant United States.

## MEMORANDUM OPINION

DONALD J. PORTER, District Judge.

### CASE SUMMARY

Plaintiff filed this action on June 17, 1980, seeking injunctive and declaratory relief from the State of South Dakota and the United States for alleged due process violations in the administration of the 1979–80 South Dakota Energy Assistance Program. Having found that this Court has the equitable authority to halt the June 30, 1980 reversion of federal funds granted to South Dakota under this program, that plaintiff's suit should be certified as a class action, and that the South Dakota administration of this program did, in fact, violate the due process rights of plaintiff's class, the Court grants the relief plaintiff seeks.

### BACKGROUND

On November 27, 1979, Congress enacted P. L. 96–126, 93 Stat. 978, granting $1.2 billion to the states for payment of energy grants "to those households experiencing significant increases in heating fuel costs over the levels of the previous year." The statute also provided that "no awards to applicants [under this program] shall be made after June 30, 1980."

Instructions for the distribution of this money were published, 44 F.R. 69032 (Nov. 30, 1979) giving the states "broad latitude to decide how they will use their allocated funds." 44 F.R. 69032. Four different alternatives were set forth. South Dakota chose Plan D, which entailed the design of its own Plan, with federal approval. The state-developed Plan was subject to certain basic requirements, including one that "[e]ligibility conditions must be based upon reasonable classifications and must not exclude individuals or groups on an arbitrary or unreasonable basis." 44 F.R. 69035.

The state notified possible recipients of the availability of money under this program, which was to involve a $300 one-time payment, by the following letter, dated January 4, 1980:

Dear ADC and/or Food Stamp Recipient:

ADC and food stamp households eligible in *December* may receive an energy payment check this month. Whether or not you receive this energy payment depends upon the following:

1) ADC and/or food stamp recipients whose case situation in December shows they have no energy costs direct or indirect (such as rent which includes fuel/utilities) will receive no energy payment.

2) ADC recipients whose case situation in December shows their shelter costs include utilities and are equal to or less than $163.00 will receive no energy payment.

Checks will be mailed around January 15. Please allow several days for delivery.

If you do not receive an energy payment and want your case reviewed, please contact your local caseworker no later than February 25, 1980.

Following the issuance of this letter, a letter dated January 16, 1980, from Governor William Janklow to Mr. James W. Ellenbecker, the Secretary of the South Dakota Department of Social Services, set forth the standards under which these payments were to be made. This largely repeated the January 4, 1980, letter quoted above, except that it contained a definition of the term "indirect energy costs."

Indirect energy costs refer to rent which includes fuel and utility expenses. Upon a request for a conference or fair hearing made within thirty (30) days of the energy payment date, an evaluation will be made to determine if heat furnished through an indirect means is inadequate and there is a demonstrated need to protect the health, safety and well-being of the ADC or food stamp recipient by supplementing the heat source with, for example, an appliance such as a space heater.

Plaintiff, whose "shelter costs" were less than $163.00, but who contends that she had indirect energy costs in December, 1979, alleges that she did not learn of this eligibility category until April, 1980, and then made application. According to plaintiff, however, the application was denied because it was not made prior to February 25, 1980.

Of the approximately $5.7 million of this money which was granted to the state, about $1.4 million is left. The state has received permission from the United States to spend the remainder of this money by making a supplemental payment of $100 to 10,000 of the people who received the initial $300 grant. Before the state could do so, however, plaintiff filed this action, and this Court granted a temporary restraining order preventing any disbursal of funds until a hearing on this action could be held.

## DISCUSSION

### I.

The threshold question to be answered is whether this Court has the power to prevent the reversion of this money to the federal treasury. The statute, cited above, places a June 30, 1980, cut-off on payments, and the instructions also state that funds not spent by June 30 must be returned to the federal government. 44 F.R. 69035, 69039. If the Court, on June 30, 1980, lacks the power to alter this, all other questions become irrelevant.

There is no doubt, however, that the Court has the power to do just this. In the case of *National Association of Regional Councils v. Costle*, 564 F.2d 583 (D.C. Cir. 1977), the court unequivocally affirmed "the power of the courts to order that funds be held available beyond their statutory lapse date if equity so requires." 564 F.2d at 588. The court said that this power stems from the "equity powers of the courts [which] allow them to take action to preserve the status quo of a dispute and to

protect their ability to decide a case properly before them . . . the courts simply suspend the operation of a lapse provision and extend the term of already existing budget authority." 564 F.2d at 588. *See also Jacksonville Port Authority v. Adams*, 556 F.2d 52 (D.C. Cir. 1977); *Los Angeles v. Adams*, 556 F.2d 40 (D.C. Cir. 1977); *National Association of Neighborhood Health Centers, Inc. v. Mathews*, 551 F.2d 321 (D.C. Cir. 1976); *Bennett v. Butz*, 386 F.Supp. 1059, 1062 (D.Minn. 1974). These cases all require that the action must be filed before the statutory lapse; since this was obviously done in this case, this Court has the discretion to halt any return of these funds to the federal government on June 30, 1980.

### II.

Plaintiff seeks to have her action certified as a class action pursuant to Rule 23(a), (b)(1) and (b)(2). This class, argues plaintiff, consists of people who would have otherwise been eligible and would have applied for a payment but for the insufficient notification of eligibility criteria announced by the state in its January 4, 1980, letter to "ADC and/or Food Stamp" recipients.[1] The state argues that no such class could exist, arguing that the notice was adequate and that "merely because some clients may have chosen not to apply for EAP does not mean they were inadequately advised." The state contends that most of the ADC/food stamp recipients who did not apply were living in family arrangements (unwed mothers living with parents, etc.) such that they did not have any energy needs.

While the state's arguments might have some validity if plaintiff was suing to compel the payment of $300 to each member of this class, such is not the case here. Plaintiff merely seeks to compel defendant Ellenbecker to give "plaintiff and members of her class legally and constitutionally sufficient notice of what is considered 'indirect energy costs' . . . and allowing . .

---

1. There were approximately 5,000 ADC/food stamp households in South Dakota in Decem-

ber, 1979, which did not receive the payment.

the opportunity to apply for, and be considered under that eligibility criterion. . . ."

It is evident that not all the ADC/food stamp recipients who did not receive a $300 payment are eligible for such a payment. The criterion which the state failed to include in its general notice makes this clear, since it states that a payment for indirect energy costs can be made only after "an evaluation" of the adequacy of the applicant's heat source, and there is a "demonstrated need to protect the . . . ADC or food stamp recipient by supplementing the heat source." Thus, there must be a case-by-case determination of who is entitled. The state has so far prevented this determination from taking place by failing to make this criterion generally known; and it is not until sufficient notice is given that the true numbers of plaintiff's class will be known. Until that time, then, the class of about 5,000 ADC/food stamp recipients who received the January 4, 1980, letter who did not apply by February 25, 1980, must be presumed to be a class of potentially eligible EAP recipients. A contention that some of these may later turn out not to be eligible does not prevent their certification as a class at this point.

The Court therefore finds that plaintiff's class is so numerous that joinder of all members is impracticable, there are questions of law or fact common to this class, the claim of the representative party will fairly and adequately protect the interests of the class, and that the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making final injunctive and declaratory relief with respect to the class as a whole appropriate. It is therefore certified as a class action pursuant to Rule 23.

## III.

Finally, the Court reaches the critical question of whether the notice given was sufficient under either the State Plan or the standards of due process. It takes little analysis to find that it did not.

Initially, it must be noted that state-designed plans such as the one before the Court were subject to 45 C.F.R. § 233.10. 44 F.R. 69038. This section, at (a)(1), provides that

(vi) Eligibility conditions or agency procedures or methods must not preclude the opportunity for an individual to apply and obtain a determination of eligibility or ineligibility.

(vii) Methods of determining eligibility must be consistent with the objective of assisting all eligible persons to qualify.

Without a doubt, the notice given to plaintiff's class failed to meet these requirements. It made no mention of the fact that funds were available to meet "indirect energy costs" and, in fact, made no mention of "indirect" costs beyond a statement that those ADC and food stamp recipients who had no direct or indirect costs would not be eligible for assistance. The state contends that this reference, taken together with the statement that those who did not receive a payment and wanted review should contact their caseworker prior to February 25, 1980, was sufficient to put potentially eligible recipients on notice of further inquiry. This Court does not agree.

The low social and educational condition of many of those who must rely on public assistance is well known. Plaintiff herself provides an example of this unfortunate state of affairs. The one reference to "indirect" costs in the notice gives the example of "rent which includes fuel/utilities." It is not at all clear to this Court, looking at this language alone, that this would include situations where there was a "demonstrated need" for a supplementary source of heat, such as space heaters, blankets and warm clothing. This Court can find no justification for placing a burden on the members of plaintiff's class to be so perceptive that they could divine such broad meaning from the small amount of information given in the notice. Clearly, a person in plaintiff's position, who had rent or utility costs of less than $163 in December, 1979, would understand from the notice that they would be

ineligible, and that any application for a payment would probably be futile.[2]

The state also contends that a press release issued by the Department of Social Services, which mentioned that "ADC or food stamps households not receiving an energy assistance check who feel they should qualify because of heating or energy-related expenses, are encouraged to contact their local case worker," should have notified plaintiff's class of this additional eligibility. This argument also is asking far too much of the plaintiff's class members; having once received official notice through the mail as to the eligibility criteria, it is unreasonable to ask people in plaintiff's position to discover additional criteria randomly placed in a newspaper. The Court must conclude, then, that the state's agency procedures here have precluded "the opportunity for an individual to apply and obtain a determination of eligibility or ineligibility."

■ Beyond the fact that these regulations have been violated, the Court makes the further finding that the inadequacy of this notice violated the due process rights of plaintiff's class. These EAP payments, like other welfare benefits, "are a matter of statutory entitlement for persons qualified to receive them." *Goss v. Lopez*, 419 U.S. 565, 573, 95 S.Ct. 729, 735, 39 L.Ed.2d 465 (1975); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Thus, the interests of plaintiff's class in these payments are entitled to the protection of due process.

It is true that most cases which deal with the extent of due process protection of welfare benefits address the question of what safeguards must be afforded existing welfare recipients whose benefits are going to be terminated. This certainly does not persuade this Court, however, that due process does not require adequate notice of newly-created welfare benefits.

■ A notice of a newly-created benefit which fails to inform a large number of the potential recipients of their eligibility deprives those people of their rights to the benefits just as surely as if they had once obtained the money, only to have the state falsely claim that they were not eligible and that it must be returned. Of particular interest in this area is the statement of the Supreme Court in *Morton v. Ruiz*, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). There, giving the example that if there were 20,000 eligible beneficiaries but funds enough for only 10,000, the Court said

> it would be incumbent upon the [agency] to develop an eligibility standard to deal with this problem, and the standard, if rational and proper, might leave some of the class otherwise encompassed by the appropriation without benefits. But in such a case the agency must, at a minimum, let the standard be generally known so as to assure that it is being applied consistently and so as to avoid both the reality and the appearance of arbitrary denial of benefits to potential beneficiaries.

415 U.S. at 231, 94 S.Ct. at 1072. *See also Mullane v. Central Hanover Bank & Trust*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (" 'The fundamental requisite of due process is the opportunity to be heard.' . . . This right . . . has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest.").

The state contends that any interest the plaintiff and her class may have had in these payments was slight compared with the state's interest in the speedy administration of the project, and that it would have been unduly burdensome to put the "indirect" cost criterion in the letter. To this, the Court will only say that the interest of a low-income welfare mother in obtaining blankets and clothing for a cold winter is not outweighed by the state's de-

---

**2.** The fact that some ADC/food stamps recipients did apply for and receive benefits under this program does not, in and of itself, indicate that the notice was sufficient. The state itself points out that these recipients are in many different situations. The state was obligated to furnish notice that would be appropriate, as far as possible, for *all* those situations.

sire to notify potential recipients with a letter one page long instead of two. Also, the fact that there may have been other programs in which plaintiff's class may have participated does not minimize their interest in this one.

## IV.

Brief mention must also be made of an issue raised by the federal defendants. They argue that the case against them must be dismissed on the ground of sovereign immunity. It is true that there is no allegation that these defendants have yet acted in any way beyond the scope of their authority. Yet, should they now act to take this money back from South Dakota before plaintiff's class has had a chance to apply, the effect would be to participate in the denial of the due process rights of plaintiff's class. This, the Court finds, would be an act beyond the scope of their authority and, as such, would not be protected by sovereign immunity, as these defendants concede. *Larson v. Domestic and Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). "Moreover, the relief sought in this matter does not call for the unauthorized expenditure of sovereign funds. On the contrary, it merely seeks to have the defendants comply with what is alleged to be a Congressional directive to spend certain funds already authorized and appropriated." *Bennett v. Butz,* 386 F.Supp. 1059, 1069 (D.Minn. 1979).

## V.

Having made these findings, the Court proceeds to the relief to which plaintiff's class is entitled. It is ordered that this action is certified as a class action, the class consisting of those ADC and food stamp households in December, 1979, which did not receive the $300 energy assistance payment; it is further ordered that a Declaratory Judgment issue that the January 4, 1980, notice to this class was legally insufficient; it is further ordered that the state defendants forthwith provide full and complete notice to this class of their rights to apply within thirty days of the date of the

notice for assistance under the EAP program which is the subject of this case, and that defendants treat any application thus made as if made prior to February 25, 1980; it is further ordered that a Permanent Injunction is issued restraining all defendants from taking any action which would prejudice the rights of plaintiff's class in these funds.