Robert BURTON, et al.

v.

Richard THORNBURGH, et al.

Civ. A. No. 80–2517.

United States District Court,
E. D. Pennsylvania.

March 22, 1982.

Janet Parrish, Steven P. Hershey, Community Legal Services, Philadelphia, Pa., for plaintiffs.

Joan K. Garner, Asst. U. S. Atty., Philadelphia, Pa., for Federal defendants.

Stanley Slipakoff, Deputy Atty. Gen., Com. Pa., Dept. of Public Welfare, Philadelphia, Pa., for Commonwealth defendants.

Andre C. Dasent, Deputy City Sol. for Energy, Philadelphia, Pa., for City defendants.

## OPINION

DITTER, District Judge.

This case challenges procedures employed in the state administration of federally funded energy assistance programs. Plaintiffs consist of four named low income individuals residing in Philadelphia who did not receive energy assistance funds and a tenants' association which is asserting the rights of its members. Defendants include various high level administrators of the Community Service Administration (CSA),[1] the Department of Health and Human Services (HHS; formerly Health, Education and Welfare, HEW), the Pennsylvania Department of Public Welfare (DPW), and the Philadelphia Allied Action Commission (PAAC). Seeking declaratory and injunctive relief, plaintiffs allege violations of federal statutes (P.L. 96–126, 93 Stat. 978; 42 U.S.C. §§ 1983, 2809(a)(5), 2812(d) (1981)), federal regulations (45 C.F.R. § 1061.70 *et seq.*), state administrative agency law (Pa.Stat.Ann. tit. 71, § 1710.1 *et seq.* (Purdon) (1962), repeal and recodified, 2 Pa.C.S.A. § 101 *et seq.* (1981)), and procedural due process and equal protection under the Fifth and Fourteenth Amendments of the United States Constitution. Specifically, plaintiffs claim defendants unlawfully stopped processing energy assistance claims after April 11, 1980, failed to provide adequate notice of denial and availability of

---

1. The Community Services Administration ceased to exist on October 1, 1981. *Omnibus Budget Reconciliation Act of 1981* §§ 682, 683(a); 42 U.S.C. §§ 9911, 9912(a) (1981).

appeal hearings to applicants, and severely limited access to assistance funds to tenants by not complying with state outreach programs. Plaintiffs seek certification as a class. All but the City defendants have filed cross motions for summary judgment. For the reasons that follow, plaintiffs' motions are denied and defendants' motions are granted.

STATEMENT OF FACTS:

1. *The Energy Assistance Programs*

In 1979, Congress enacted Public Law 96–126 allocating funds to states for distribution to low income households for heating assistance during the winter. These energy allowances were supplied under two federal programs: the Energy Assistance Program (EAP), administered by HEW, and the Energy Crisis Assistance Program (ECAP), administered by CSA.[2] Under federal regulations governing EAP, eligibility for assistance funds was based on income or participation in other assistance programs. Persons were eligible for EAP funds if their total household income did not exceed 125 percent of the CSA poverty level or the households received assistance through Aid to Families with Dependent Children (AFDC), food stamps, or statewide programs of regularly paid general assistance. 44 Fed.Reg. 69034 (1979). ECAP funds were limited to households with incomes not exceeding 125 percent of the CSA poverty level and households receiving Supplemental Security Income (SSI).

The administrative notice promulgated by HEW delineated four plans under which states could distribute EAP funds. 44 Fed. Reg. 69032–34 (1979). At its discretion, a state could have used a combination of plans. 44 Fed.Reg. 69034 (1979).

The state of Pennsylvania, acting through its Department of Public Welfare,

originally elected to distribute energy assistance funds according to Plan C, one of the options federal regulations afforded it. 44 Fed.Reg. 69035 (1979). Under Plan C, all state EAP funds were transferred to ECAP. The transfer enabled DPW to distribute all state energy assistance funds in accordance with ECAP regulations. See note 2 *supra*. As required by federal regulations, this election was approved by HEW and CSA.

In April, 1980, DPW amended its state plan, electing to distribute any then remaining assistance funds (approximately $6.9 million) in accordance with Plan B. Under Plan B, the state could use AFDC, food stamps, or general assistance as a basis for categorical eligibility. 44 Fed.Reg. 69035 (1979). Additionally, states were authorized to make flat payments of EAP funds to participants in the other entitlement programs. 44 Fed.Reg. 69033.(1979). Pennsylvania's amended plan provided for a flat grant of $25. from EAP funds to each household receiving AFDC which had not received prior energy assistance.[3] To effectuate the $25. flat payment plan, DPW did not accept applications for EAP after April 11, 1980. Crisis assistance, however, was available until June 30, 1980. Public Law 96–126 required that any energy assistance funds (EAP or ECAP) remaining unobligated on July 1, 1980, revert to the federal government.

2. *Administration of the Programs in Pennsylvania*

In Pennsylvania, DPW had state-wide responsibility for administering the energy assistance programs. It contracted with county assistance offices and other community action agencies to administer the programs at the local level. These local agen-

2. The purpose of EAP funds was to provide money to reimburse low income households for their increased, normal fuel costs. ECAP funds, on the other hand, were intended to provide payments for emergency, i.e., crisis, expenses. The administrative notice regarding EAP and various distribution plans was pro-

mulgated November 30, 1979. 44 Fed.Reg. 69032 *et seq.* (1979). Regulations governing ECAP are found at 45 C.F.R. § 1061.70 (1980).

3. HEW's administrative notice provided that duplicate payments were to be avoided. 44 Fed.Reg. 69034 (1979).

cies made eligibility determinations,[4] conducted outreach programs,[5] and provided short term crisis assistance such as blankets, warm clothing, and fuel. In accordance with its contract with local agencies, DPW was required to monitor local administration of the energy assistance program. Some monitoring problems were reported due to a lack of administrative funds. No monitoring, however, was undertaken regarding the availability of appeal hearings for denial of benefit determinations.

There was a maximum payment to each household under the energy assistance programs of $400. Limitations on payment for regular energy assistance (EAP) were based on the type of fuel supplied.[6] Actual payment levels were based on the percentage price increase of the primary heating fuel over the previous year. Payment of crisis assistance funds (ECAP) was based on need so long as the $400. maximum set for all assistance was not exceeded. If a household needed fuel and was in arrears with its dealer, the funds could be used to pay fuel/utility bills or establish a line of credit with fuel/utility vendors. More typical examples of short term crisis assistance were furnace repairs, warm clothing, and blankets.

Both programs also were designed to provide assistance to tenants who indirectly paid heating costs, i.e., where the cost of heat was included in their rent. Each renter was required to obtain a notarized statement from his landlord specifying the amount of rent allocated to heat expense and containing assurances that the rent would be reduced by the amount of assistance provided. This statement was necessary to prevent abuse of the assistance program. Because many landlords refused to supply the required statement, tenant participation in the programs was markedly lower than by those who directly paid heating costs.

For those applicants denied energy assistance benefits due to an ineligibility determination, notice of denial and right to an appeal hearing was required. This notice was provided by that organization making the ineligibility determination, county board's of assistance and community action agencies, on form PWEA–3. In Philadelphia, DPW informed applicants of denials.

### 3. Administration of the Programs in Philadelphia

Local administration of the crisis assistance program in Philadelphia was performed by the Philadelphia Allied Action Commission (PAAC) with which DPW contracted to distribute $286,000. in emergency assistance funds. Contrary to procedures employed with all other community action agencies involved in distributing crisis assistance funds, PAAC did not make eligibility determinations. Rather, eligibility determinations for ECAP were made by the County Board of Assistance (CBA).[7] PAAC distributed funds, conducted outreach, and tried to solve energy crisis problems.

So far as ECAP moneys were concerned, PAAC's clients filled out application forms stating their emergency and the type of assistance needed. To be approved, all ap-

---

4. In Philadelphia, eligibility determinations were performed by the County Board of Assistance rather than the community action agency, PAAC. See note 7 infra.

5. Pennsylvania's state plan required extensive outreach activities. Performed by DPW staff and community action agencies, the public relations campaign included display of posters, use of door to door solicitation, television and radio spots, newsreleases, mass mailing, and notice to organizations designed to help low income individuals.

6. Maximum payments were as follows:

| Oil and Kerosene | $350. |
| Natural Gas | $300. |
| Electricity | $275. |
| All Other | $250. |

7. In Philadelphia, no one received crisis assistance without an initial determination by CBA that he was eligible for regular assistance. CBA's eligibility determination, therefore, applied to both EAP and ECAP. If an applicant was deemed ineligible for energy assistance, DPW sent him a notice of ineligibility. As PAAC was uninvolved in eligibility determinations, it was not responsible for sending out denial notices.

plications had to be accompanied by a certification of eligibility from CBA.[8] Officials of PAAC then decided whether an emergency situation existed and the proper course of action to abate the crisis. As a matter of routine, all applicants with a CBA certification of eligibility were provided with some form of crisis assistance. In most instances, service was provided within 24 hours of the client's application to PAAC. Applicants who did not have a CBA certification were denied crisis payments.

One problem with which PAAC had to deal was the amount that could be paid for crisis assistance. As previously noted, there was a maximum of $400. for all energy assistance. In all instances, applicants to PAAC for crisis funds had already received the regular energy assistance to which they were entitled. Thus, in most instances, only $50. or $100. could be paid for crisis assistance. Occasionally, however, exceptions were made when the service needed would require more than was available to the applicant. In these instances, PAAC turned to an "overage fund" supplied by CSA.[9]

Another problem was those persons who failed to supply all information necessary to process their application. These individuals were informed verbally by PAAC regarding the required information and that their applications must be complete by June 30, 1980, the termination date of the program. While awaiting completion, these applications were placed in a "waiting" file. In many instances the applicant never returned. No notice of a denial of eligibility was sent to them by DPW because PAAC's failure to receive necessary information was not considered a denial.

Despite the April 11, 1980, termination date for regular energy assistance, PAAC continued to process crisis assistance applications until June 30, 1980, in accordance with its contract. CBA, however, stopped making eligibility determinations on April 11, 1980. See note 7 *supra*. Therefore, in Philadelphia no new applicants were determined eligible for ECAP after April 11, 1980.[10] PAAC did service 619 people for crisis assistance between April 11 and June 30, 1980, but all had been certified eligible by CBA prior to April 12. In about 10 cases, however, PAAC provided crisis assistance to uncertified applicants after having been referred to the applicant by another agency.[11] Because these recipients had not been certified eligible by CBA, their assistance funds were drawn from the CSA overage account.

Following institution of this suit, it was revealed that approximately $37,000. remained in PAAC's crisis assistance account. Pursuant to stipulation by the parties and court approval of August 7, 1980, all remaining funds were distributed to the named plaintiffs and other eligible residents of Philadelphia.

CONSTITUTIONAL CLAIMS

1. *Equal Protection*

Plaintiffs first contend they were not afforded equal protection of the law. The basis of this claim is the fact that they were denied energy assistance funds because they had not established their eligibility before April 11, 1980, as contrasted with other low income persons who had applied

---

8. In cases where applicants did not have CBA certification, PAAC tried to expedite the certification process. Sometimes, PAAC would arrange for home visits by CBA officials. (Deposition of Nancy Sennott at 7).

9. The overage fund totalled $30,000. In most instances, it was used to finance oil deliveries because most oil vendors refused to deliver a $50. order. Approximately $5,000. of the fund was used to repair furnaces.

10. The system in practice in Philadelphia required that only those people who were certified to be eligible for regular assistance by CBA could receive crisis assistance from PAAC. Because CBA stopped making eligibility determinations for regular assistance on April 11, 1980, only those people certified eligible as of that date were eligible to receive crisis assistance from PAAC.

11. One was referred by the Veteran's Administration, two by the Prison Society, five were referred by Andrea Schneiderman of the County Board of Assistance. Deposition of Nancy Sennott at 20–23. There is no information on the record regarding the other two people.

prior to that time.[12] Plaintiffs allege that DPW officials acted in an arbitrary and capricious manner when they set the April termination date and changed the distribution plan.

■ The United States Supreme Court has never held that individuals have a right to receive welfare or other types of subsistence payments. See J. Nowack, Constitutional Law 681 (1978). Once provided for by state statute, however, an individual can claim an entitlement to these benefits if he is within the class of eligible recipients. This entitlement triggers due process and equal protection guarantees.

■ The class in this case which the named plaintiffs purport to represent is comprised of those low income individuals who may have been eligible, but did not receive energy assistance funds. In *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16, reh. denied, 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973), the Supreme Court, in dicta, noted that classifications based on wealth alone are not suspect requiring a strict scrutiny analysis. *Id.* at 23–29, 93 S.Ct. at 1291–1294. See also *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491, reh. denied, 398 U.S. 914, 90 S.Ct. 1684, 26 L.Ed.2d 80 (1970) (class comprised of AFDC recipients receiving maximum payment did not require strict scrutiny test). Moreover, the Supreme Court never has held that *potential* recipients have a fundamental right to receive public assistance benefits. Therefore, classifications based on wealth should be subjected only to a rational basis analysis. *See San Antonio School District, supra.*

Thus, if the Court finds a rational relationship between the challenged classifications and the governmental purpose of the legislation, the Court should uphold the classification.[13]

■ I am satisfied DPW was not arbitrary and capricious in its decision to amend the state plan in April, 1980, and that the classification does have a rational basis. The Commonwealth defendants assert, and I agree, that the change in distribution plans provided an efficient way to allocate remaining funds to avoid over-expenditure of the federal grant and a resort to state funds. See Action Memorandum of March 21, 1980, issued by John Pazour, a DPW official. The federal regulations provided that a state would be responsible for any funds spent in excess of its allocation. 44 Fed.Reg. 69035 (1979). Obviously there had to be some provision for winding down the program and its eventual termination. At some time, there had to be a determination of how much money was left for distribution and a plan formulated to spend the remaining funds. If this had not been done carefully, it might have been done unlawfully. If it had not been done with sufficient lead-time, the nightmare of reversion to the federal treasury might have become a reality. Perhaps the date to stop taking applications might have been better set at April 15, or May 1, or some other date. I do not know, but by April 11, the heating season is drawing to a close for most Pennsylvania residents and there is no basis on which I can say DPW's selection of that date and change of distribution plans was not a valid exercise of state power or viola-

---

**12.** In Philadelphia, the April termination date for EAP eligibility determinations also prevented post-April 11th applicants from receiving crisis assistance funds (ECAP). See note 7 *supra.*

**13.** In *Dandridge v. Williams, supra,* the Court stated:

In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it

does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." 397 U.S. at 485, 90 S.Ct. at 1161. (citations omitted)

The Court continued:

... the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients. 397 U.S. at 487, 90 S.Ct. at 1163. (citations omitted)

tive of the Constitution. There was, therefore, no violation of equal protection.[14]

■ Plaintiffs also contend that the $25. plan and April 11 termination decision did not comport with the applicable federal statute and regulations. Public Law 96–126 required that states give priority to households experiencing significant increases in heating fuel costs over the previous year. Plaintiffs allege that a flat grant of a specific amount of money to all households did not satisfy the statute's priority requirement of aid to the neediest households. I am satisfied that defendants acted in accordance with the intent of Congress in this respect. It is common knowledge that home heating costs rose dramatically during the years in question, thus affecting all persons paying for heat in this area of the country.

Because the applicable federal regulations delineated income and category eligibility restrictions for energy assistance funds, distribution to these people represents aid to the neediest households. In this case, the $25. flat grant went to AFDC recipients who had not yet received energy assistance. Therefore, defendants acted according to the intent of Congress.

■ Plaintiffs also claim that $25. is insufficient to help low income households pay for increased energy costs. Initially, it should be noted that Congress did not intend the program to pay for all fuel costs of eligible recipients. Additionally, the $25. distribution plan was a product of DPW

planning to avoid overspending the federal grant while providing the maximum number of eligible households with energy assistance. A federal court should defer to administrative expertise when the agency makes a determination pursuant to statutory and regulatory authority.[15] *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971) (court not empowered to substitute its judgment for that of the administrative agency). Unless DPW violated constitutional protections, acted contrary to legislative authority, or made an arbitrary or capricious decision, I should not overrule its administrative finding that the remaining money should be distributed by a payment of $25. to each household receiving AFDC which had not received energy assistance. *See* 2 Pa.C.S.A. § 704 (1981); 5 U.S.C. § 706 (1977). In this case, the $25. flat grant plan was expressly authorized by federal regulations. 44 Fed.Reg. 69035 (1979). Therefore, the federal defendants were authorized to approve the program. Additionally, under the federal regulation, DPW could have elected at the outset to distribute all available funds by direct grant to AFDC recipients, not merely the remaining $6.9 million. As I have already discussed above, the $25. distribution plan was neither violative of the Constitution nor arbitrary and capricious. *See* pp. 174–175 *supra.* Because none of the prerequisites for court modification of the agency decision has been met, I will not devise what I

14. Although not addressed by the parties, a violation of equal protection could have occurred when a non-resident of Philadelphia who had not been determined eligible for EAP prior to April 11, 1980, received crisis assistance after that date upon a determination of eligibility from his CBA or CAA. The above situation was impossible for a resident of Philadelphia due to the linkage between EAP and ECAP eligibility determinations. See note 7 *supra.* I conclude, however, that such disparities were supported by a rational basis and thus there was no equal protection violation. The eligible population for energy assistance in Philadelphia was so large as to require the central administration of eligibility determinations in CBA. If not for this central administration, it is likely that many households would have received energy assistance more than

once, an occurrence which would undoubtedly have deprived other households of receiving assistance.

15. Although it can be argued that this principle is inapplicable because the issue involves federal court review of state administrative interpretation of federal statutes and regulations, I see no reason to depart from it in this case. Because Congress saw fit to allow the states broad discretion in the distribution of energy assistance funds, I should not substitute my judgment for that of the state agency charged with administering the program. 44 Fed.Reg. 69032 (Nov. 30, 1979); *Grueschow v. Harris*, 492 F.Supp. 419 (D.S.D.), *aff'd* 633 F.2d 1264, 1265 (8th Cir. 1980).

think is a more effective or efficient distribution system.

■ Another concern is that if I found the $25. distribution plan violative of federal statute and regulations, the $6.9 million would have been unobligated by June 30, 1980, and would, therefore, now revert to the federal treasury. P.L. 96–126, 93 Stat. 978 (1979). Plaintiffs, however, argue that I possess equitable powers to order funds held available beyond the statutory lapse date and re-direct them as equity and justice so require. *See National Association of Regional Councils v. Costle,* 564 F.2d 583, 588 (D.C.Cir.1977); *Jacksonville Port Authority v. Adams,* 556 F.2d 52, 56 (D.C.Cir. 1977); *City of Los Angeles v. Adams,* 556 F.2d 40 (D.C.Cir.1977); *National Association of Neighborhood Centers, Inc. v. Mathews,* 551 F.2d 321, 338–39 (D.C.Cir.1976); *Grueschow, supra.* Although plaintiffs are correct in their assertion a more thorough exposition of the applicable law is necessary. The district court has equitable power to "suspend the operation of a lapse provision and extend the term of already existing budget authority. If, however, budget authority has lapsed before suit is brought, there is no underlying congressional authority for the court to preserve." [16] *National Association of Regional Councils, supra,* 564 F.2d at 588–89. This, however, is a discretionary power of the court, *Grueschow, supra,* 492 F.Supp. at 422, to be exercised only if equity and justice so require. *See National Association of Councils, supra,* 564 F.2d at 588; *Jacksonville Port Authority, supra,* 556 F.2d at 56; *City of Los Angeles, supra,* 556 F.2d at 50–51; *National Association of Neighborhood Health Centers, supra,* 551 F.2d at 338–39; *Grueschow, supra.*

In this case, suit was filed on June 27, 1980, three days before the budget authority lapse date of June 30, 1980. Because the budget authority existed as of the date of suit, I do possess the equitable power to suspend operation of the June 30, 1980,

lapse provision and re-direct application of the funds. Plaintiffs, however, have not persuaded me that if I found the $25. plan invalid, equity and justice require an alternative distribution plan. In fact, if I did use my equitable powers and for example, ordered a larger flat grant per household, fewer people would receive energy assistance funds. This certainly would not be considered equitable by those households which would be excluded under a court created plan. Had I found the $25. flat grant unconstitutional, I would have had to weigh the inequity and equity of some court created plan against the inequity and equity of returning the entire $6.9 million to the federal tax payers. I am by no means sure that my plan of distribution would be so superior to the flat grant program conceived by DPW that the equities of returning the money to the tax payers may not have prevailed. In any event, the $25. flat grant violated neither the Constitution nor applicable standards and regulations.

As regards the April 11 termination decision, there is no requirement in the state or federal regulations that all money allocated to the state must be paid out. Rather, the federal statute merely specifies that no funds allocated under the energy assistance programs could be obligated after June 30, 1980. P.L. 96–126, 93 Stat. 978 (1979). Therefore, the April 11, 1980, termination date was a valid exercise of state power.

The county and city of Philadelphia experienced problems due to the April 11 termination date that were not shared elsewhere in Pennsylvania. In all counties except Philadelphia, eligibility determinations were performed by the same agency distributing the funds. In Philadelphia, however, while all eligibility determinations were made by the county board of assistance, crisis assistance funds were distributed by PAAC. Because the CBA would not certify anyone eligible after April 11, 1980, for EAP funds, no *new* applicant was determined eligible for crisis assistance after

---

**16.** The basis for this equitable power is the court preserving existing authority created by

Congress rather than the creation of authority.

that date.[17] Although it might have been more effective to provide some mechanism for eligibility determinations for short term crisis assistance after the April 11, 1980, termination date, plaintiffs have failed to show me how DPW's procedure violated any federal regulations. For example, plaintiffs have not established that the use of any crisis funds to finance the $25. plan would arguably be a violation of federal regulations.[18] Additionally, although the April termination date did have an effect of depriving some potential recipients of receiving energy assistance funds, the statute and regulations do not require state administrative agencies to maintain the same distribution program throughout the year. 44 Fed.Reg. 69034 (1979). For the above stated reasons, therefore, the plaintiffs' allegations that the April 11 termination date and $25. flat grant plan violated the federal statute or regulations are without merit.

### 2. *Procedural Due Process*

Plaintiffs claim that the Commonwealth and City defendants violated due process by failing to provide written notice of a denial or the right to assistance. It is further alleged that these defendants failed to give adequate advance notice of the April 11 termination date and change in state plans, or provide a period of public comment prior to its implementation.

■ The United States Supreme Court has recognized that public assistance benefits are a matter of statutory entitlement for persons eligible to receive them. *Goldberg v. Kelly,* 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970). Mere desire, need, or unilateral expectation of receiving or continuing to receive public assistance benefits does not constitute a property interest protected by the 5th and 14th Amendments. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Rather, to establish a protected property interest in a particular benefit, the potential recipient must demonstrate a claim of entitlement. *Goldberg, supra,* 397 U.S. at 262, 90 S.Ct. at 1017.

■ Plaintiffs in this case have failed to establish a valid claim of entitlement to energy assistance benefits.[19] For example, plaintiffs, Burton, Hopkins, and Lowery failed to present adequate documentation to PAAC to receive benefits as required by state practice.[20] Affidavits of Burton, Hopkins, and Lowery. According to their own affidavits, these plaintiffs were informed of the deficiency in their documentation. Their failure to receive benefits, therefore, did not constitute a denial of eligibility status. Because these plaintiffs did not fulfill prerequisites necessary for determination of eligibility, they did not establish a claim of entitlement to the funds. Hence, they had no property interest in energy assistance benefits.

■ Plaintiff Miles received crisis assistance from PAAC in February, 1980. Affidavit of Miles. Returning for addition-

17. However, 619 people who were determined eligible for regular energy assistance before April 11, 1980, were given crisis assistance after that date. Deposition of Nancy Sennott at 17-18. See note 7 *supra* and accompanying text.

18. Regulations governing distribution of crisis funds under ECAP limit eligibility to households with incomes at or below 125% of the CSA poverty level and households receiving SSI benefits. 45 C.F.R. 1061.70–9(a) (1980). Therefore, crisis funds could not be distributed by a flat grant to AFDC recipients. That grant distribution was permitted for EAP funds only. 44 Fed.Reg. 69032 *et seq.* (1979).

19. The supplemental affidavits filed by plaintiffs on February 6, 1982, do not alter my find-

ings as to the procedural due process claim. Because none of the affiants was deemed ineligible for ECAP and none failed to apply for energy assistance due to inadequate notice of the April 11 termination date, their assertions are irrelevant.

20. Plaintiff Burton failed to be certified eligible for EAP by CBA prior to April 11, 1980. Lacking such certification, Burton did not present adequate documentation to receive benefits from PAAC. Hopkins failed to present a $40. electric company receipt requested by PAAC. Lowery did not supply any documentation proving that his family used one name rather than two as alleged by PAAC.

al crisis assistance in May, 1980, Miles was informed by PAAC that it only provided assistance once per applicant. Affidavit of Miles. This was part of the administrative policy of the crisis assistance program.[21] Having received crisis assistance in February, 1980, Miles was ineligible in May of that year. Failing to establish eligibility, Miles cannot claim an entitlement triggering due process protections. Affidavits of non-parties such as Carole Wong, do not set forth specific facts from which a claim of entitlement and a denial of due process could be established. Fed.R.Civ.P. 56(e). Wong's affidavit states she was denied assistance because of her failure to produce a utility shut-off notice. Although a shut-off notice is not required by federal regulations,[22] Wong failed to specify whether she applied for assistance before or after April 11, 1980, a fact crucial to her due process claim. The affidavit is therefore defective for lack of specificity under Rule 56(e).

Assuming these plaintiffs could establish entitlement they further complain of due process violations by the Commonwealth and City defendants' failure to provide written notice of a right to appeal and a fair hearing upon the ineligibility determination. The exhibits submitted in this case include an application form and denial of assistance form. Both documents contain language explaining the applicant's right to appeal the administrative decision.[23] The Commonwealth defendants maintain that these forms were distributed to all applicants. I conclude that the statements on these forms were sufficient notice to all applicants of their right to appeal.[24] Whether these forms actually were distributed would be a genuine issue of material fact if plaintiffs had produced affidavits setting forth specific facts showing that individuals did not receive the forms. Fed. R.Civ.P. 56(e). Plaintiffs have failed to do so. The affidavit of Attorney Jeffrey Greenwald alleging that no written notice

**21.** *See, Theriault v. Brennan*, 488 F.Supp. 286, 302 (D.Me.1980) aff'd 641 F.2d 28 (1st Cir. 1981) (one time distribution of crisis assistance was necessary to prevent a breakdown of processing applications due to large number of applications and was within discretion of state administrative agency). See Deposition of Nancy Sennott at 49 (enunciating same reasons for the one time payment rule).

**22.** DPW newsrelease of November 12, 1979 and memorandum of October 10, 1979, from DPW official John Pazour.

**23.** The application for assistance contained the following statement directly above the area designated for the applicant's signature:

... I understand that I have a right to a hearing if I am not satisfied with the action taken on my application by the County Assistance Office. My signature on this application grants permission to the County Assistance Office to contact my fuel supplier to verify the information I have given concerning this request for assistance.

The notice of eligibility or ineligibility contained the following language:

RIGHT TO APPEAL AND A FAIR HEARING
If you are not satisfied that the County Assistance Office has understood and considered all the facts in making its decision about your eligibility, or the amount of money you will receive, of if you feel you were treated unfairly, you or your representative

have the right to ask for and have a fair hearing.

You may ask for a fair hearing by writing or talking to a staff member of your local County Assistance Office, within 30 days from the date of this notice.

You have the right to appear at the hearing in person and to be represented by a lawyer or other person if you so desire. You can ask a staff member of the County Assistance Office how to arrange for a lawyer to help you explain the facts at the hearing; or you can take a friend with you to the hearing to help present the facts.

Prior to the hearing, you or your representative have the right to examine all the information that the County Assistance Office will introduce as evidence in the hearing. In the hearing, an official who did not take part in the decision on your case will talk with you. You have the right to present evidence in your own behalf; to bring witnesses; and, to confront and cross-examine any person who is to be presented as a witness against you. All the facts will be studied and a ruling will be made as to whether the decision of the County Assistance Office is in accordance with the Department's regulations or whether it should be changed.

**24.** Because of this finding, plaintiffs have failed to establish any violation of Pennsylvania Administrative Agency Law. 2 Pa.C.S.A. § 101 *et seq.* (1981).

of denial or right to an appeal hearing was provided by the local agency in Northampton County, fails to meet the specificity requirement of Rule 56(e). This affidavit also is based on hearsay. Rule 56(e) requires that an affidavit supporting a motion for summary judgment be made by an affiant competent to testify to matters stated in the affidavit, be made on personal knowledge, and set forth facts admissible in evidence. Fed.R.Civ.P. 56(e). Attorney Greenwald's affidavit fails in all respects. It also should be noted that no affidavit filed in support of plaintiffs' motion for summary judgment alleged sufficient facts to support a claim that procedural due process had been denied, i.e., the applicant would have been eligible for assistance, had applied before April 11, 1980, was determined ineligible for assistance, and received no written notice of denial or right to appeal.

■ Plaintiffs also claim these same circumstances violate federal regulations. This allegation is meritless. Plaintiffs cite 45 C.F.R. § 1061.70–7(c)(5)(i) as authority for requiring written notice to applicants denied crisis assistance. The regulation provides:

> (5) In addition, operators will develop procedures for reviewing denials of assistance which will include:
>
> (i) Provisions for notifying the applicant in writing of the reasons for denial of assistance, that he/she may request a review of the denial and may submit additional information ... which the applicant believes would warrant a favorable determination;

This regulation must be read in conjunction with 45 C.F.R. § 1061.70–7(b)(3), defining "denial of assistance" for purposes of ECAP. The regulation provides:

> [T]here has been a denial of assistance when the benefits or services and/or

funds currently are available, the local program operator has the authority to provide or disburse them, and the applicant falls within or believes that he/she can prove that he/she falls within the income eligibility and established program guidelines.

The plain language of the regulation indicates that none of the named plaintiffs were denied assistance within the meaning of the regulation.[25] Because Burton, Hopkins, and Lowery failed to supply adequate documentation for ECAP, the local program operator, PAAC, had no authority to disburse the funds. 45 C.F.R. § 1061.70–7(b)(3) (1980). Because Miles already had received ECAP, he was not entitled to receive additional assistance and PAAC had no authority to provide it. *Id.* Therefore, no denial of assistance occurred and no written notice of denial was required.

■ Plaintiffs final constitutional claim alleges due process violation owing to a lack of notice or public hearing regarding the April 11, 1980, termination date and the transition from Plan C to B. As regards public notice, in the news release of March 24, 1980, DPW formally announced that April 11 would be the last day to apply for energy assistance under EAP.[26] This serves as sufficient public notice to all potential recipients. Again, assuming plaintiffs established an entitlement to energy assistance funds, the lack of public hearings prior to implementation of the April 11 termination date or switch to Plan B did not violate due process or federal regulations. In *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Court delineated three factors to be considered to determine the specific requirements of due process. *Id.* 424 U.S. at 335, 96 S.Ct. at 903.

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of

---

25. Because the affiants of the supplemental affidavits were not denied assistance, their assertions are irrelevant.

26. The Chavis and Delgado affidavits indicate they were unaware of the energy assistance programs until after June 30, 1980, the final termination date. This is unfortunate for these individuals but there is no due process, statutory, or regulatory requirement of individual notice to potential recipients. *Grueschow, supra*, 633 F.2d at 1266–67.

such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Of course, the private interest in being able to heat one's home warrants strong consideration. Similarly, the Commonwealth's interest in an efficient distribution of funds to avoid overexpenditure or reversion to the federal government justifies substantial weight. Determinative in this matter, however, is the risk of erroneous deprivation and the value in holding hearings on the transition from Plan C to B. Plaintiffs have failed to establish the value hearings would have had in lessening the risk of erroneous deprivation. In their memorandum of law, plaintiffs claim that a larger flat grant per household would have been more beneficial. It is obvious, however, that larger grants to certain households would result in fewer families being served. This may have been less beneficial than the $25. plan. I fail to see how hearings concerning this issue would have avoided the risk of erroneous deprivation. It also should be noted that there are administrative burdens in holding hearings. By the time hearings were held on the decision to switch from Plan C to B, the term of the grant could have expired and the spector of reversion to the federal government become a reality.[27]

Plaintiffs also complain that the lack of public notice or opportunity for comment prior to finalization of the April 11 termination decision was a violation of federal statute and regulations. First, I have already determined that the newsrelease of March 24, 1980, was sufficient public notice of the

April 11 termination date and change from Plan C to B. See p. 180 supra. Second, there is nothing in the federal statutory scheme requiring a comment period when a state amends its distribution plan.

Public Law 96–126 was designed to give the states broad latitude to decide how they would use energy assistance funds. P.L. 96–126, 93 Stat. 978 (1979); 44 Fed.Reg. 69032 (1979); Grueschow, supra, 633 F.2d at 1265. In adopting a plan of distribution, a state need only have sought approval by HEW. 44 Fed.Reg. 69033 (1979). There were no requirements of public hearings prior to adopting a plan. Additionally, states were permitted to distribute funds under more than one plan. 44 Fed.Reg. 69034 (1979). In this case, DPW decided to change distribution plans to avoid overexpenditure and secured federal approval on June 26, 1980. I find that DPW did not violate due process and complied with the federal statute and regulations in changing Pennsylvania's distribution plan and providing for a $25. flat grant pursuant to Plan B. Furthermore, there has been no suggestion that these provisions violate due process protections.

### 3. Adequacy of Outreach Program— Participation of Tenants

Plaintiffs claim the outreach methods employed by the Commonwealth and City defendants were inadequate to notify tenants who paid energy costs indirectly of their potential eligibility for energy assistance funds.[28] The flyers distributed by DPW did not mention specifically that funds were available to tenants. Had these flyers been the sole means of advertising the energy assistance programs, the Grueschow case would be very supportive of plaintiffs' views on this issue.[29] It should

---

27. Plaintiffs have not persuaded me that hearings on this matter would have made any difference to any named plaintiffs or the class they purportedly represent.

28. Energy costs are included as part of a tenant's rent.

29. In Grueschow, supra, the Court of Appeals for the Eighth Circuit noted that the state's outreach notices had to be reasonably complete and accurate. Although need not contain detailed eligibility requirements, "the notice must reasonably identify the persons or groups who are potentially eligible for benefits." Grueschow, supra, 633 F.2d at 1267. The outreach notice distributed by DPW in the present case

be noted however, that various newsreleases by DPW specifically stated that tenants were eligible for energy assistance funds.[30] Additionally, the flyers also encouraged persons in specified income brackets to call the local assistance office for more information. I am satisfied that the Commonwealth defendants complied with federal regulations requiring an effort to notify tenants of available energy payments.

Plaintiffs further claim the documentation required of tenants to establish eligibility served to exclude them from participation in the programs. The most significant barrier to participation plagued those tenants who paid "indirect" energy costs (i.e., energy charges were included in the rent). Each tenant in this category was required to produce a notarized statement from his landlord setting forth the percentage of total rent paid by the tenant allocated to heating costs. The landlord also was required to agree to reduce the tenant's rent by the amount of energy assistance paid directly to the landlord.

█ It is reasonable for DPW to require documentation to support an applicant's claim. Only by requiring such documentation will the administrative agency protect itself from fraudulent claims and preserve available funds for the neediest households.[31] With regard to the landlord's agreement, this was to protect the tenant and agency. In the January 10, 1980, news release, Secretary O'Bannon expressed a concern that landlords might raise rents merely due to the availability of energy assistance payments. This would defeat the purpose of the program with regard to tenants. Considering the possible abuses of the program, the landlord's agreement was a reasonable requirement.

In view of the substantial number of tenants who participated in the energy assistance program,[32] I conclude that administrative officials acted within the bounds of their power and discretion in requiring this documentation from tenants.

### 4. *Fuel Vendor Service on Credit*

█ Plaintiffs' final claim alleges that the Commonwealth and City defendants violated federal regulations by failing to require fuel dealers to provide service on credit upon proof of customer eligibility for ECAP. DPW initiated a procedure which was intended to permit eligible applicants to obtain fuel even though they could not advance the funds to pay for it. Upon determining eligibility, local agencies issued energy crisis assistance authorizations which were then to be forwarded to Harrisburg for payment.[33] Because most fuel dealers refused to supply fuel until payment was received, service to eligible applicants was delayed 10 to 18 days and in some cases longer.[34] Although aware of this problem, officials of DPW did not believe they had legal authority to force dealers to supply fuel on this type credit arrangement. Deposition of Samuel Fresa at 16–17.

The federal regulations specify in pertinent part:

The Governor is required to undertake activities in order to reach agreement with utility/fuel vendors to ensure that in each case where payment is certified that:

(a) reconnection of utilities and/or delivery of fuel is made upon certification for payment.

did identify the persons who were eligible for benefits.

**30.** News releases of December 12, 1979; January 10, 1980; January 31, 1980.

**31.** Although the method employed may not have been the best way to achieve this goal, it is not for a court to devise an alternative means. See *Citizens to Preserve Overton Park v. Volpe, supra,* (court's judgment should not be substituted for that of the administrative agency).

**32.** Commonwealth's response to Plaintiffs' Request for Admissions No. 22 indicates 3878 tenants paying indirect energy charges were found eligible for EAP assistance.

**33.** Harrisburg was the location of central administration for all energy assistance programs in Pennsylvania.

**34.** See supplemental affidavits filed by plaintiffs on February 6, 1982. Docket Entry No. 45.

**182**

45 C.F.R. § 1061.70–15 (1980). These defendants readily admit they had little success in securing agreements with fuel vendors to deliver on credit. One DPW official, Samuel Fresa, stated there were few fuel vendors who would deliver for $25. or $50. because no profit was made on deliveries of less than $100. Similarly, a PAAC official stated that it was successful in getting only two fuel vendors to agree to make $50. deliveries. Deposition of Nancy Sennott at 14.

The plain language of the applicable federal regulation merely required the Governor, through DPW, his duly authorized agent, "to undertake activities in order to reach agreements with utility/fuel vendors." 45 C.F.R. § 1061.70–15 (1980). As I read this language consummation of such agreements, though the ideal conclusion to DPW's efforts, was not mandated. Rather, it was DPW's *efforts* to secure the agreements that were required. The defendants state that they tried to get fuel vendors to deliver $25. and $50. amounts on credit, but in large part failed in this endeavor. Additionally, defendants claim they lacked legal authority to force vendors to enter into credit arrangements on small deliveries. Furthermore, plaintiffs cite no existing legal authority that fuel dealers can be required to deliver involuntarily. Because defendants tried to secure credit and small delivery arrangements, I am satisfied they complied with the applicable federal regulation. Perhaps if they were armed with legal authority defendants would have been required to take additional action. Under the circumstances, however, defendants made the required effort to secure fuel vendor agreements and notwithstanding their failure, complied with federal regulations.

CONCLUSION

Because I have determined that plaintiffs failed to establish any basis upon which they or the class members they purport to represent could recover, plaintiffs' motion

---

**35.** Although the City defendants have not moved for summary judgment, all claims against them have been resolved in their favor.

for class certification is hereby denied. As required by Federal Rule of Civil Procedure 56, I have found there is no genuine issue as to any material fact. I also have determined that *all* defendants are entitled to judgment as a matter of law.[35] Therefore, summary judgment will be granted in favor of all defendants, and plaintiffs' motion for summary judgment will be denied.

Accordingly, I will grant summary judgment in favor of the City.